# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 4, 2011

No. 09-60823

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

UNDRA DEMETRIUS JOHNSON,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, CLEMENT, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Defendant-Appellant Undra Demetrius Johnson appeals his conviction under 18 U.S.C. § 2250(a) for failure to register as a sex offender under the Sex Offender Registration and Notification Act ("SORNA"). He challenges the validity of the Act and the decision of the Attorney General to apply it to persons whose convictions for sex crimes predate its enactment.

## I.

As part of a plea agreement, Johnson stipulated to the relevant facts. In 1995, Johnson was convicted in a Mississippi court for gratification of lust, a sex

No. 09-60823

offense. Johnson was sentenced to eight years in prison, four years suspended. Prior to his release in May 1999, Johnson signed an Acknowledgment of Convicted Sex Offender's Duty to Register under Mississippi law. In 2002 and 2004, Johnson signed two additional Mississippi state forms acknowledging his duty to register. In 2005, Johnson moved from Mississippi to Iowa and signed Iowa's Sex Offender Registry Notification of Registration Requirement form.[1] In January 2008, Johnson returned to Mississippi and failed to register as a sex offender with the State of Mississippi.

On January 22, 2009, Johnson was indicted on one count of violating 18 U.S.C. § 2250(a) by traveling in interstate commerce and knowingly failing to register and update a registration in accordance with SORNA. Johnson moved to dismiss the indictment on various constitutional grounds, and the district court denied the motion. Johnson then entered a guilty plea pursuant to a plea agreement, reserving the right to raise his constitutional challenges on appeal. Johnson was sentenced to thirty-seven months in prison to be followed by a life term of supervised release. He filed a timely notice of appeal.

II.

On July 27, 2006, President George W. Bush signed into law the Adam Walsh Child Protection and Safety Act of 2006.[2] Title I of the Act includes SORNA, which "establishes a comprehensive national system for the registration

---

[1] In 2007, Johnson was convicted under Iowa state law for failure to register as a sex offender for what appears to be a failure to update his registry.

[2] Pub. L. No. 199-248, §§ 101–155, 120 Stat. 587, 590–611 (2006).

No. 09-60823

of [sex] offenders,"[3] requiring all sex offenders to register their residence and place of employment using state-based registries. Specifically, the registration provisions read as follows:

**(a) In general**

A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

**(b) Initial registration**

The sex offender shall initially register—

(1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or

(2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.

**(c) Keeping the registration current**

A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) of this section and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry. That jurisdiction shall immediately provide that information to all other jurisdictions in which the offender is required to register.

**(d) Initial registration of sex offenders unable to comply with subsection (b) of this section**

The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction, and to prescribe rules for the

---

[3] 42 U.S.C. § 16901.

No. 09-60823

registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section.[4]

A separate provision of SORNA created a federal criminal offense for traveling interstate and failing to register as a sex offender.

(a) IN GENERAL.—Whoever—
      (1) is required to register under the Sex Offender Registration and Notification Act; . . .
      (2)(B) travels in interstate or foreign commerce . . .; and
      (3) knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act; shall be fined under this title or imprisoned not more than 10 years, or both.[5]

SORNA further directs each state to substantially implement its requirements or lose ten percent of the state's funding under the Omnibus Crime Control and Safe Streets Act.[6]  SORNA gave local jurisdictions three years to comply and authorized the Attorney General to grant up to two one-year extensions.[7]  As a result, most states will not be in compliance until July 2011.

In contrast to the grace period offered to states, the Attorney General began enforcing SORNA as though it provided immediate penalties for sex offenders who failed to register.  Many defendants challenged SORNA's application to pre-enactment offenders.[8]  In response, on February 28, 2007,

---

[4] 42 U.S.C. § 16913.

[5] 18 U.S.C. § 2250(a).

[6] 42 U.S.C. § 16925(a).

[7] 42 U.S.C. § 16924.

[8] *See, e.g.*, *United States v. Madera*, 474 F. Supp. 2d 1257 (M.D. Fla. 2007).

No. 09-60823

seven months after SORNA's enactment, the Attorney General issued an interim regulation stating that SORNA's requirements "apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act."[9]   The Attorney General noted that he was issuing the rule to foreclose the argument that SORNA did not apply to defendants with convictions before the Act's enactment, regardless of whether the statute on its face included them or not.  The regulation was issued without a notice-and-comment period and without a thirty-day waiting period, both of which are mandated by the Administrative Procedure Act ("APA").[10]   The Attorney General relied upon the good cause exception in the APA to excuse the lack of notice-and-comment and waiting period.[11]   He published a justification for good cause at the time the rule was issued:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements—and related means of enforcement, including criminal liability under 18 U.S.C. 2250 for sex offenders who knowingly fail to register as required—to sex offenders whose predicate convictions predate the enactment of SORNA. Delay in the implementation of this rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect

---

[9] Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8897 (Feb. 28, 2007); *see* 28 C.F.R. pt. 72 (2008).

[10] 5 U.S.C. § 553(b), (c) (stating that notice of proposed rulemaking "shall be published in the Federal Register" and that the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments"); 5 U.S.C. § 553(d) (requiring that a "substantive rule" be published "not less than 30 days before its effective date").

[11] 72 Fed. Reg. at 8896–97; *see* 5 U.S.C. § 553(b)(B) (creating an exception to the notice and hearing requirements "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest").

No. 09-60823

the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions. The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as provided by SORNA. This would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

It would accordingly be contrary to the public interest to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b) or with the delayed effective date normally required under 5 U.S.C. 553(d).[12]

The rule took immediate effect. The Attorney General accepted post-promulgation comments through April 30, 2007, but did not respond to comments in the *Federal Register*.[13] The regulation published in the *Code of Federal Regulations* was identical to the interim rule.[14] On May 30, 2007, the Attorney General issued a notice of rulemaking for the full regulatory

---

[12] 72 Fed. Reg. at 8896–97.

[13] In December 2010, the Attorney General took steps to convert the "interim" rule from February 2007 to a "final" rule, which included responding to comments presumably submitted between February and April 2007. The Attorney General noted that these comments "were similar to comments received on the portions of the proposed SORNA Guidelines" from May 2007. *See* 75 Fed. Reg. 81,849, 81,850 (Dec. 29, 2010).

[14] *Compare* 72 Fed. Reg. at 8897, *with* 28 C.F.R. pt. 72 (2008).

No. 09-60823

implementation of SORNA.[15]   This proposal included a subsection on the applicability of SORNA to pre-enactment offenders, noting that the Attorney General had addressed this issue in its earlier rulemaking.  Nevertheless, the Attorney General received public comments on SORNA's retroactivity and responded to those comments in the publication of the final SORNA regulations, which were issued and made effective on July 2, 2008.[16]

## III.

Johnson puts forth seven challenges to his conviction under SORNA.  We review these challenges *de novo*,[17] but our case law forecloses five of these claims.  First, Johnson asserts he never received notice that he was required to register under SORNA, a denial of due process under the Fifth Amendment.  Johnson knew of his obligation to register as a sex offender in Mississippi but was not directly notified of the SORNA requirements or increased federal penalties.   Johnson further argues both that SORNA exceeds Congress's authority under the Commerce Clause and that by directing the Attorney General to decide if SORNA applies retroactively, SORNA violates the non-delegation doctrine.  In *United States v. Whaley*, we rejected nearly identical claims.[18]  We conclude that Johnson's prosecution did not violate due process;

---

[15] 72 Fed. Reg. 30,210 (May 30, 2007).

[16] 73 Fed. Reg. 38,030 (July 2, 2008).

[17] *See United States v. Luna*, 165 F.3d 316, 319 (5th Cir. 1999).

[18] 577 F.3d 254, 260–64 (5th Cir. 2009) (finding that due process was satisfied through the defendant's knowledge of his duty to register under state law; SORNA is a valid exercise under the Commerce Clause; and delegation to the Attorney General was permissible).

7

No. 09-60823

further, SORNA is valid under both the Commerce Clause and the principles of non-delegation.

Next, Johnson claims that the retroactive application of SORNA violates the Ex Post Facto Clause because it is punitive, non-civil, and exposes him to criminal prosecution for non-compliance. We previously addressed this issue in *United States v. Young* and rejected the appellant's challenge to SORNA under the ex post facto prohibitions of the Constitution.[19] Applying our holding to Johnson, we again find that SORNA does not violate the Ex Post Facto Clause. Lastly, Johnson argues that SORNA does not apply to him because Mississippi has not yet implemented SORNA.[20] In *United States v. Heth*, we found that the defendant was required to register under SORNA regardless of whether the state had implemented SORNA's administrative requirements.[21] This argument is foreclosed.

We now address two matters of first impression for this court: (1) whether SORNA violates the Tenth Amendment by requiring state officials to administer federal law; and (2) whether the regulations issued by the Attorney General violated the Administrative Procedures Act.

---

[19] 585 F.3d 199, 206 (5th Cir. 2009). In so holding, we noted that Congress delegated the decision of retroactivity to the Attorney General. *Id.* at 201. We also operated under the assumption that the Attorney General's rulemaking was valid, but no APA claims were before the court at that time. *Id.*

[20] Mississippi is one of forty-seven states to have requested and received an extension until July 27, 2011 to substantially implement SORNA. *See* U.S. Dep't of Justice, SORNA Extensions Granted (Aug. 2, 2010), http://www.ojp.usdoj.gov/smart/pdfs/SORNA_Extensions_Granted.pdf.

[21] 596 F.3d 255, 259 (5th Cir. 2010).

No. 09-60823

IV.

Johnson claims that imposing a federal obligation on sex offenders to register in state-run registries is an unconstitutional federal encroachment on state sovereignty. He argues that SORNA requires local law enforcement to accept registrations through a federally mandated sex offender program, violating *Printz v. United States*.[22] There, the Court held that "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program."[23]

Before turning to the merits, we must consider our own jurisdiction over this issue and determine whether Johnson has standing to pursue it.[24] In addressing Tenth Amendment standing, some of our sister courts of appeals have relied on the 1939 decision of *Tennessee Electric Power Co. v. Tennessee Valley Authority*, in which the Supreme Court denied a private party Tenth Amendment standing.[25] In *Tennessee Electric*, private utilities asserted that the

---

[22] 521 U.S. 898 (1997) (invalidating a federal law that required local law enforcement officials to conduct background checks of prospective handgun purchasers).

[23] *Id.* at 935.

[24] *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (internal quotation marks omitted); *Nevares v. San Marcos Consol. Ind. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997) (recognizing that "[f]ederal courts have no jurisdiction . . . unless a case or controversy is presented by a party with standing to litigate").

[25] 306 U.S. 118, 144 (1939) ("[T]here is no objection . . . by the states, and, if this were not so, the appellants, absent the states or their officers, have no standing in this suit to raise any question under the [Tenth] amendment."); *see, e.g.*, *Brooklyn Legal Servs. Corp. B. v. Legal*

9

No. 09-60823

Tennessee Valley Authority, a corporation created by Congress, acted to impermissibly federally regulate purely local matters of electricity sales. This claim was predicated on state interests in acting as regulatory authorities, but no states were parties before the Court. Similarly, Johnson's Tenth Amendment claim is based on the unconstitutionality of SORNA as it affects the State of Mississippi, which is not a party to the case.

However, *Tennessee Electric*'s applicability to Johnson's case may be questioned because it assessed standing in the context of the long-since-repudiated "legal interest" test,[26] rather than the modern Article III standing requirements articulated in *Lujan v. Defenders of Wildlife*.[27] These modern requirements are: (1) an injury in fact that is concrete and actual or imminent, (2) a causal connection between the injury and challenged action of the defendant, and (3) a likelihood (not mere speculation) that the injury would be redressed by a favorable decision.[28] Johnson was injured by being imprisoned under SORNA; the statute led to his injury; and he would find relief if this court struck down SORNA under the Tenth Amendment. On this basis, he has satisfied *Lujan*'s Article III standing requirements.

---

*Servs. Corp.*, 462 F.3d 219, 234–36 (2d Cir. 2006); *Medeiros v. Vincent*, 431 F.3d 25, 33–36 (1st Cir. 2005).

[26] *See Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153–54 (1970) (recognizing Article III standing for petitioners and differentiating standing tests based on prior decisions such as *Tennessee Electric*).

[27] 504 U.S. 555, 560–61 (1992).

[28] *See Lujan*, 504 U.S. at 560-61; *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002).

No. 09-60823

Our sister circuits are divided over whether, in spite of *Lujan*, *Tennessee Electric* prohibits private parties from challenging the constitutionality of a federal statute on Tenth Amendment grounds.[29] Recently, the Supreme Court granted certiorari in a case with this precise question: "[w]hether a criminal defendant convicted under a federal statute has standing to challenge her conviction on grounds that, as applied to her, the statute is beyond the federal government's enumerated powers and inconsistent with the Tenth Amendment."[30] While this is a weighty constitutional issue, we need not address it here. Prudential standing principles require that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on

---

[29] The First, Second, Third, Eighth, and Tenth Circuits have held that private parties do not have standing to bring such claims. *See United States v. Shenandoah*, 595 F.3d 151, 161–62 (3d Cir. 2010); *United States v. Hacker*, 565 F.3d 522, 526 (8th Cir. 2009); *Brooklyn Legal Servs. Corp. B. v. Legal Servs. Corp.*, 462 F.3d 219, 234–36 (2d Cir. 2006); *Medeiros v. Vincent*, 431 F.3d 25, 33–36 (1st Cir. 2005); *United States v. Parker*, 362 F.3d 1279, 1284 (10th Cir. 2004). The Seventh and Eleventh Circuits have permitted private parties to assert Tenth Amendment claims. *See Gillespie v. City of Indianapolis*, 185 F.3d 693, 700 (7th Cir. 1999), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008); *Atlanta Gas Light Co. v. U.S. Dep't of Energy*, 666 F.2d 1359, 1368 (11th Cir. 1982). Of these, *Shenandoah* and *Hacker* both addressed the issue in the context of interpreting SORNA, while the remaining cases answered the question in the course of analyzing other claims. In a Tenth Amendment case brought by a state that lacked a relevant injury, the Ninth Circuit held "[o]nly states have standing to pursue claims alleging violations of the Tenth Amendment by the federal government." *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 972 (9th Cir. 2009). In an unpublished opinion, the Ninth Circuit more explicitly affirmed its position that private parties lack Tenth Amendment standing. *Stop the Casino 101 Coalition v. Salazar*, 384 F. App'x 546, 548 (9th Cir. 2010) (unpublished) ("We also remind STOP that it is the settled law of this circuit that only states have standing to bring Tenth Amendment claims.") (citing *Legal Servs. Corp.*, 552 F.3d at 972).

[30] Petition for Writ of Certiorari at I, *Bond v. United States*, No. 09-1227 (U.S. filed Apr. 9, 2010), 2010 WL 1506717, *appeal from* 581 F.3d 128 (3d Cir. 2009), *cert. granted* 131 S. Ct. 455 (2010). We note, however, that the petitioner in *Bond* predominantly challenges the criminal statute at issue as exceeding Congress's authority under Article I. In contrast, Johnson asserts that SORNA impermissibly interferes with an aspect of state sovereignty.

11

the legal rights or interests of third parties."[31]   Johnson's assertion of Mississippi's Tenth Amendment rights makes tenuous his prudential standing. These prudential standing limitations speak to judicial modesty, allowing federal courts to "avoid deciding questions of broad social import where no individual rights would be vindicated,"[32] but it is an unneeded avoidance when there is a clear answer to the merits question, as here.[33]   In a SORNA case similar to Johnson's, the Fourth Circuit found that "prudential standing questions may be avoided in order to decide a case on the merits."[34]   Given the pending Supreme Court decision and the simplicity of the merits of Johnson's Tenth Amendment claim, it is appropriate for us to assume without deciding that Johnson has prudential standing.[35]

The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the

---

[31] *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978) (internal quotation marks omitted).

[32] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100 (1979)); *see also Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 n.43 (5th Cir. 2001) (quoting *Phillips*).

[33] *See Nisselson v. Lernout*, 469 F.3d 143, 151 (1st Cir. 2006) ("[The] ban on hypothetical jurisdiction extends only to issues involving Article III jurisdiction and, hence, Article III standing.  There is no counterpart rule that demands the resolution of objections based on prudential concerns before other issues can be adjudicated."); *Grubbs v. Bailes*, 445 F.3d 1275, 1281 (10th Cir. 2006) (holding that Article III standing issues must be resolved but "[q]uestions relating to *prudential* standing . . . may be pretermitted in favor of a straightforward disposition on the merits").

[34] *Kennedy v. Allera*, 612 F.3d 261, 270 n.3 (4th Cir. 2010).

[35] Although we address Johnson's standing to bring this claim, the result remains the same regardless of the Supreme Court's decision in *Bond* because of our decision on the merits.

No. 09-60823

States respectively, or to the people."[36]  It is neither a description of a result nor a political guide of governance.  It is a force, enforceable in the courts as well as the political arena.  In direct terms, relevant here, "Congress cannot compel the States to enact or enforce a federal regulatory program."[37]

Johnson argues that SORNA impermissibly requires states to accept federal sex offender registrations.  While SORNA orders sex offenders traveling interstate to register and keep their registration current, SORNA does not *require* the States to comply with its directives.  Instead, the statute allows jurisdictions to decide whether to implement its provisions or lose ten percent of their federal funding otherwise allocated for criminal justice assistance.[38]  Of course the Tenth Amendment does not forbid conditioning of federal funding on a state's implementation of a federal program.[39]  It follows that the sex offender registry bargained for here is a valid exercise of Congress's spending power.

V.

Turning to the regulations issued by the Attorney General and the requirements of the Administrative Procedure Act, we again first consider whether Johnson has standing.  The Supreme Court recently granted a writ of certiorari on the same question that is before us—whether a petitioner "ha[s]

---

[36] U.S. Const. amend. X.

[37] *Printz v. United States*, 521 U.S. 898, 935 (1997).

[38] 42 U.S.C. § 16925(a).

[39] *See South Dakota v. Dole*, 483 U.S. 203, 210-11 (1987) (holding that Congress constitutionally exercised its spending power in conditioning federal highway funding on a minimum state drinking age).

No. 09-60823

standing under [SORNA] to raise claims concerning the Attorney General's interim rule."[40] Consistent with our usual practice, we resolve Johnson's appeal based on current law.[41]

With the three elements of constitutional standing at hand,[42] we note that Johnson's APA claim is a procedural injury—that the Attorney General did not provide for proper notice and comment. Johnson may assert this claim of procedural error "without meeting all the normal standards for redressability and immediacy."[43] As the Supreme Court explained, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered."[44] "[T]he likelihood and extent of impact are properly addressed in connection with the merits" in a harmless error analysis.[45] Similarly, Johnson meets the redressability

[40] Petition for Writ of Certiorari at i, *United States v. Reynolds*, No. 10-6549 (U.S. filed Sept. 14, 2010), *appeal from* 380 F. App'x 125 (3d Cir. 2010), *cert. granted* 79 U.S.L.W. 3248 (2011).

[41] *See, e.g.*, *United States v. Lopez-Velasquez*, 526 F.3d 804, 808 n.1 (5th Cir. 2008).

[42] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (describing the "irreducible constitutional minimum of standing" as consisting of injury in fact, causation, and redressability).

[43] *Id.* at 573 n.7.

[44] *Id.*

[45] *Save Our Heritage, Inc. v. Fed. Aviation Admin.*, 269 F.3d 49, 56 (1st Cir. 2001) ("A reasonable claim of minimal impact is enough for standing even though it may not trigger agency obligations."); *see* Richard J. Pierce, Jr., *Making Sense of Procedural Injury*, ADMIN. L. REV., Winter 2010, at 1, 11 (noting that "courts invariably hold that a party has standing attributable to a procedural injury when it alleges that it was unlawfully deprived of the

14

No. 09-60823

requirement to challenge an APA deficiency by the Attorney General that subjected him to imprisonment; he need not establish that a favorable decision by this court would result in a different rulemaking by the Attorney General.

The primary constitutional standing issue in Johnson's APA claim is whether his injury was caused by the Attorney General's action. If the statute on its face applied SORNA's requirements to pre-enactment convictions, then Johnson would be subject to SORNA regardless of the Attorney General's rulemaking. Thus, his injury would not be "fairly . . . trace[able] to the challenged action" of the Attorney General.[46] However, if Congress delegated to the Attorney General the decision of whether to apply SORNA to pre-enactment offenders, then Johnson's injury directly stemmed from the Attorney General's rulemaking process. It follows that Johnson's standing to contest the rulemaking requires that the statute on its face did not order him to comply with the registration requirements.[47]

Our sister courts of appeals differ in their conclusions about SORNA's reach and its corresponding delegation of authority to the Attorney General. Five circuits have held that the Act did not apply to offenders with pre-enactment convictions until the Attorney General issued the regulation.[48] In

---

notice-and-comment rulemaking procedure" but those same courts also "routinely apply the harmless error rule" to agency APA failures).

[46] *Lujan*, 504 U.S. at 560.

[47] *See United States v. Hacker*, 565 F.3d 522, 528 (8th Cir. 2009) (finding that appellant challenging SORNA did not have standing to challenge the registration rules on APA grounds because he was not personally affected by the rules).

[48] *United States v. Valverde*, No. 09-10063, 2010 WL 5263142, *2 (9th Cir. Dec. 27, 2010); *United States v. Hatcher*, 560 F.3d 222, 226–29 (4th Cir. 2009); *United States v. Cain*, 583 F.3d 408, 414–19 (6th Cir. 2009); *United States v. Dixon*, 551 F.3d 578, 582 (7th Cir. 2008),

No. 09-60823

addition, our own court has previously endorsed this position with little pause.[49]

Yet four other circuits have held that the language of the statute itself applied

the provisions to persons with pre-SORNA sex-offense convictions.[50]   The

Supreme Court acknowledged this conflict but had no occasion to decide the

issue in *Carr v. United States*.[51]   However, Justice Alito's dissent in *Carr*, joined

by Justices Thomas and Ginsburg, endorsed the delegation interpretation:

> When SORNA was enacted, Congress elected not to decide for
> itself whether the Act's registration requirements–and thus
> § 2250(a)'s criminal penalties–would apply to persons who
> had been convicted of qualifying sex offenses before SORNA
> took effect.   Instead, Congress delegated to the Attorney
> General the authority to decide that question.[52]

We agree with the views expressed in Justice Alito's dissent and with the

Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits—SORNA delegated

---

*rev'd on other grounds*, 130 S. Ct. 2229 (2010); *United States v. Madera*, 528 F.3d 852, 857–59
(11th Cir. 2008).

[49] *United States v. Young*, 585 F.3d 199, 201 (5th Cir. 2009) (per curiam) ("Congress left
it to the Attorney General's discretion whether SORNA would apply to sex offenders convicted
before the Act's passage . . . ."). In *Young*, we addressed whether or not SORNA violated the
Ex Post Facto Clause. Although used to frame the argument, our conclusion with respect to
whether the statute or the Attorney General's rule did the work to apply the registry
requirements to pre-enactment offenders was peripheral. As such, it "may not have received
the full and careful consideration of the court that uttered it." *Int'l Truck & Engine Corp. v.
Bray*, 372 F.3d 717, 721 (5th Cir. 2004) (internal quotation marks omitted).

[50] *United States v. Fuller*, 627 F.3d 499, 504–05 (2d Cir. 2010); *United States v.
Shenandoah*, 595 F.3d 151, 163–64 (3d Cir. 2010); *United States v. May*, 535 F.3d 912, 915–19
(8th Cir. 2008); *United States v. Hinckley*, 550 F.3d 926, 929–35 (10th Cir. 2008).

[51] 130 S. Ct. 2229, 2234 n.2 (2010).

[52] *Id.* at 2246 (Alito, J., dissenting); *see also id.* at 2246 n.6 ("The clear negative
implication of that delegation is that, without such a determination by the Attorney General,
the Act would not apply to those with pre-SORNA sex-offense convictions.").

No. 09-60823

authority to the Attorney General to determine the applicability of SORNA to pre-enactment offenders. The Supreme Court has repeatedly counseled that in statutory interpretation, "courts must presume that a legislature says in a statute what it means and means in a statute what it says."[53] Further, "[w]hen the statutory language is plain, the sole function of courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."[54] Here, § 16913(d) states "[t]he Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before [enactment] . . . ."[55] This language is not ambiguous. Following the plain meaning rule, this phrase delegates to the Attorney General the decision of whether and how the SORNA registration requirements apply to offenders with pre-enactment convictions.

We recognize that statutory interpretation is a "holistic endeavor,"[56] and other circuits have concluded that in context, subsection (d) does not unambiguously indicate that Congress delegated such wide authority to the Attorney General.[57] The Eighth and Tenth Circuits cite to an unpublished

---

[53] *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

[54] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (internal quotation marks omitted).

[55] 42 U.S.C. § 16913(d).

[56] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).

[57] *See Hinckley*, 550 F.3d at 934; *May*, 535 F.3d at 918. The entirety of subsection (d) reads: "The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before [July 27, 2006] or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any

17

No. 09-60823

Georgia district court opinion in holding that subsection (d) was ambiguous.[58] That district court found the statute could be read to include past offenders within (and not as a separate group from) the broader classification of "other categories of sex offenders who are unable to comply with subsection (b)."[59] This reading is not wholly implausible.[60] However, the district court went on to find that the Attorney General did not have authority over offenders who had previously registered in state registries. The court concluded that since subsection (b) addressed *initial* registration, the Attorney General's authority in subsection (d) must only include those offenders who were unregistered prior to SORNA's enactment. Offenders with pre-SORNA convictions who had previously registered in state registries would then be required to comply with subsections (a) and (c) regardless of the Attorney General's rules addressing unregistered offenders. The title of subsection (d) becomes prominent in this view as it provides: "Initial registration of sex offenders unable to comply with subsection (b) of this section."

---

such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section." 42 U.S.C. § 16913(d).

[58] *United States v. Beasley*, No. 07-CR-115-TCB, 2007 WL 3489999, at *4–6 (N.D. Ga. Oct. 10, 2007).

[59] Subsection (b) defines the timeline for when offenders must initially register—either before completing a prison sentence or no later than three business days after being sentenced, if the sentence does not include imprisonment. Obviously, sex offenders who completed prison sentences before SORNA was enacted could not comply with this subsection.

[60] Other courts have pointed to the potential problems with this claim. *See Cain*, 583 F.3d at 415; *Hatcher*, 560 F.3d at 228 (finding that including pre-SORNA offenders within the set of "'other categories of sex offenders' who are unable to comply with the initial registration requirements . . . ignores the term 'other'" and is equivalent to "interpreting a statute that applies to 'humans and to other categories of primate who walk on two legs' as excluding paraplegic humans") (quoting *Hinckley*, 550 F.3d at 951 (McConnell, J., dissenting)).

18

We respectfully disagree with this analysis. To conclude that the Attorney General's authority is limited to unregistered offenders would require the court to disregard the first clause of subsection (d). The subsection gives the Attorney General two powers: (1) to specify the applicability of the subchapter to pre-enactment offenders; and (2) to prescribe registration rules for those offenders who cannot comply with subsection (b). Grammatical construction matters in statutory interpretation.[61] If Congress intended the Attorney General to determine SORNA's applicability for only those who could not comply with subsection (b), the sentence would not contain two clear clauses, separated by both an "and" and a comma. Abiding by normal rules of grammar, this sentence delegates two responsibilities to the Attorney General.

The subsection's title does invite confusion to the statutory scheme, but "a title alone is not controlling."[62] "That the heading of [a section] fails to refer to all the matters which the framers of that section wrote into the text is not an unusual fact. That heading is but a short-hand reference to the general subject matter involved."[63] The general subject matter of § 16901(d) is sex offenders who cannot comply with SORNA's requirement that registration be completed before the end of a prison sentence. Pre-enactment offenders may be included in this general subject, but the heading alone does not indicate whether SORNA's

---

[61] *See Bloate v. United States*, 130 S. Ct. 1345, 1348 (2010) (noting that ignoring grammar "would violate settled statutory construction principles"); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (discussing the comma usage in a statute and holding that interpretation is "mandated by the grammatical structure of the statute").

[62] *I.N.S. v. St. Cyr*, 533 U.S. 289, 308 (2001).

[63] *Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528 (1947); *see also Cain*, 583 F.3d at 416 (quoting *Brotherhood* in interpreting SORNA).

No. 09-60823

requirements apply to such offenders. Moreover, "headings and titles are not meant to take the place of detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis."[64] For these reasons, the Supreme Court has held that "the heading of a section cannot limit the plain meaning of the text."[65] As discussed above, the plain meaning of the text supports a reading that Congress delegated the Attorney General to determine whether the requirements would be applied to pre-enactment offenders. The heading of subsection (d) may not be interpreted to limit that plain text delegation.

Read in context of the entire Act, it may seem that § 16913 requires all pre-enactment offenders to register. Specifically, § 16913(a) states that "a sex offender shall register," and the statutory definition of a sex offender is "an individual who was convicted of a sex offense."[66] These broad provisions could indicate that all convicted offenders, even those convicted prior to SORNA, "shall register."[67] However, canons of construction resolve this seeming conflict. "Specific terms prevail over the general in the same or another statute which otherwise might be controlling."[68] Here, the specific reference to persons

---

[64] *Brotherhood of R.R. Trainmen*, 331 U.S. at 528.

[65] *Id.* at 529; *see also Penn. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) (quoting *Brotherhood*).

[66] 42 U.S.C. § 16911.

[67] *See Fuller*, 627 F.3d at 504–05.

[68] *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *see also Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("A general statutory rule usually does not

20

No. 09-60823

convicted before enactment found in subsection (d) informs us that those individuals are controlled by that subsection rather than the broad provision in subsection (a).  Elsewhere in SORNA, all sex offenders may be treated alike, but § 16913 specifically differentiates offenders convicted before enactment; we must acknowledge Congress's instruction to distinguish this group for the purposes of this subchapter.[69]

Some courts have been persuaded by policy and legislative intent arguments.  While we do not find the plain text of this statute ambiguous, courts are split on the issue, and we consider the congressional intent and policy factors to ensure the completeness of our analysis.  The Tenth Circuit, for example, concluded that "it was Congress's desire to create a comprehensive and uniform registration system among the states to ensure offenders could not evade requirements by simply moving from one state to another."[70]  Yet prior to SORNA, offenders could not evade the requirements of registration simply by moving because each state had its own registry system.  Moving from Iowa to

govern unless there is no more specific rule."); *In re Nobleman*, 968 F.2d 483, 488 (5th Cir. 1992) (citing *Ginsberg* and holding that specific language prevails over general language).

[69] *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) (comparing language in the RICO statute and holding that similar less expansive language in one section differs in meaning from the broader language used in a nearby section).

We also note that SORNA creates a federal crime.  Thus, if the statute were ambiguous, the rule of lenity would apply.  Accordingly, we would resolve any ambiguity so the statute applies "only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997); *United States v. Rivera*, 265 F.3d 310, 312 (5th Cir. 2001).  Both the Sixth Circuit and the Eleventh Circuit noted the rule of lenity in their SORNA decisions. *Madera*, 528 F.3d at 859 n.7; *Cain*, 583 F.3d at 417.

[70] *Hinckley*, 550 F.3d at 933.

No. 09-60823

Nebraska did not eliminate one's pre-SORNA registration duties; it made the offender subject to Nebraska registration law rather than Iowa law.

The Sixth Circuit analyzed the House and Senate bills that were combined to create SORNA and concluded, as do we, that Congress intended to delegate to the Attorney General the authority to determine whether SORNA's registration requirements applied to pre-enactment offenders.[71] Most persuasive in this analysis was Senate Bill 1086, which specifically contemplated whether the registration requirements would apply retroactively to pre-enactment offenders. The parallel provision to § 16913(d) in that bill read:

> (8)   RETROACTIVE   APPLICATION—The Attorney General shall have the authority to—
>
> (A) specify the applicability of the requirements of this title to individuals who are covered individuals based on a conviction or sentencing that occurred prior to the date of enactment or who are, as of the date of enactment of this Act, incarcerated or under a non-incarcerative sentence for some other offense;
>
> (B) specify the applicability of the requirements of this title to all other individuals who are covered individuals based on a conviction or sentencing that occurred prior to the enactment date of enactment of this Act . . . ; and
>
> (C) specify procedures and methods for the registration of individuals to whom the requirements of this title apply pursuant to subparagraph (A) or (B).[72]

---

[71] *United States v. Cain*, 583 F.3d 408, 417–19 (6th Cir. 2009).  Unenacted bills have limited persuasive value, but they do provide an insight into the evolution of the language that became the final statute, which is in question here.

[72] S. 1086, 109th Cong. § 104(a)(8) (2005).

No. 09-60823

The specifics of the statute closely parallel the construction of the Senate bill, with section 8B and 8C each comprising one clause of § 16913(d). If the exegesis into legislative history is to be taken, the Senate draft expresses an intent to give the Attorney General authority to determine the applicability of the Act to pre-enactment offenders.

Our colleagues on the Tenth Circuit have asserted that "Congress was likely concerned with old convictions—offenders who had already served their sentences and never before had been required to register."[73] Congress had good reason to be concerned with this group of individuals, and indeed, the second clause of subsection (d) specifically authorizes the Attorney General "to prescribe rules for the registration" of those persons. But if that is read to be the entirety of the work assigned in subsection (d), there is no reason to include the first clause in the statute. We cannot ignore the plain language of the first clause based on a hypothesis of congressional intent or logic.

Finally, many courts have been persuaded by policy arguments that "[t]here would be no reason for Congress to exempt" sex offenders with pre-SORNA convictions from the registry if the goal was to create a comprehensive database.[74] Yet Congress could have struck for a comprehensive and uniform

---

[73] *Hinckley*, 550 F.3d at 934.

[74] *Id.*; *see also Fuller*, 627 F.3d at 505 ("Given SORNA's objectives, we do not think Congress was so agnostic as to whether the half million sex offenders convicted prior to SORNA's enactment were required to comply with SORNA's registration requirements as to grant the Attorney General sole authority over that determination."). We note that the vast majority of those 500,000 pre-enactment sex offenders were in compliance with state registration requirements at SORNA's enactment. At most, 30% of pre-enactment offenders did not have their state registrations up-to-date. *See* 152 Cong. Rec. S8012, S8013 (daily ed. July 20, 2006) (statement of Sen. Hatch) (explaining that there were half a million registered sex offenders in the United States and as many as 150,000 with missing information).

23

registration system while relying on the Attorney General to define its specifics. SORNA did not require that the national registry be immediately created. The Act gave states years to comply with its requirements, and only three states to-date have complied. Giving the Attorney General authority to determine the statute's application to pre-enactment offenders would allow an agency that is an expert in criminal law to negotiate the details of retroactivity and the interactions between the pre-existing state systems.

We find relevant the Supreme Court's discussion in *Carr*, describing the background of sex-offender registries.[75] There, the Court noted that "federal sex-offender registration laws have, from their inception, expressly relied on state-level enforcement."[76] Congress preserved the collaboration between state and federal resources in SORNA. It is not unreasonable to conclude that Congress intended the Attorney General to consider whether and how SORNA would apply to pre-enactment convictions, particularly given the administrative demands of integrating the state registries into a national program. Even if Congress's concern was to locate sex offenders who had failed to register under state programs, the broader statutory goal still does not determine how we interpret the individual provision of § 16913. "Vague notions of a statute's basic purpose are . . . inadequate to overcome the words of its text regarding the *specific* issue under consideration."[77] Congress could have explicitly denoted that SORNA's registration requirements and penalties applied to pre-enactment

---

[75] *See Carr*, 130 S. Ct. at 2238–41.

[76] *Id.* at 2238.

[77] *Carr*, 130 S. Ct. at 2241 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993)).

No. 09-60823

offenders, but it did not.[78]  A belief that such an application would advance the statute's broader goals cannot free the interpretive enterprise from plain text.

With our conclusion that § 16913(d) did not automatically include pre-SORNA offenders, it is evident that Johnson presents a claim of injury resulting from any failure of the Attorney General to comply with the APA.

VI.

Under the APA, agencies issuing rules must publish notice of proposed rulemaking in the *Federal Register*[79] and "shall give interested persons an opportunity to participate in the rule making" by allowing submission of comments.[80]  In addition, the APA requires that publication of a substantive rule "shall be made not less than 30 days before its effective date."[81]  The APA provides that both of these requirements may be bypassed if "good cause" exists. The exception states that notice is not required "when the agency for good cause

---

[78] While some courts reason that Congress must have wanted SORNA to include pre-enactment offenders, one could just as easily assume Congress was uncertain about the fate of those individuals given courts' presumptions against retroactivity and the statute's lack of explicit language.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[C]ongressional enactments . . . will not be construed to have retroactive effect unless their language requires this result.").  Although this court and the majority of other appellate courts have found that SORNA does not violate the Ex Post Facto Clause, at the time of its enactment, Congress would have had reason to be concerned that the registration requirements fit the category of a law "'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'"  *Stogner v. California*, 539 U.S. 607, 612 (2003) (quoting *Calder v. Bull*, 3 Dall. 386, 390–91 (1798)).  As such, Congress delegated the Attorney General to determine which registration requirements—any, some, or all—applied to those with pre-enactment offenses.

[79] 5 U.S.C. § 553(b).

[80] 5 U.S.C. § 553(c).

[81] 5 U.S.C. § 553(d).

No. 09-60823

finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."[82]  In executing his authority under § 16913, the Attorney General failed to comply with either the notice-and-comment procedures or the thirty-day notice provision, relying on the "good cause" exception.[83]

The courts of appeals are divided over whether the Attorney General properly complied with the APA.  The Fourth and Eleventh Circuits did not find an APA violation, while the Sixth and Ninth Circuits held that the Attorney General lacked good cause.[84]  The Supreme Court has acknowledged the conflict but "express[ed] no view" on the matter.[85]

We review the Attorney General's actions using the APA's standard: agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[86]  In so doing, we are prohibited from substituting our judgment for that of the agency.[87]  Further, it

---

[82] 5 U.S.C. § 553(b); *see also* S. Doc. No. 248, 79th Cong., 2d Sess. 200 (1946) (noting that exemptions to notice-and-comment require "[a] true and supported or supportable finding of necessity or emergency").

[83] 72 Fed. Reg. 8894, 8896 (Feb. 28, 2007).

[84] *Compare United States v. Gould*, 568 F.3d 459, 469–70 (4th Cir. 2009), *and United States v. Dean*, 604 F.3d 1275, 1278–82 (11th Cir. 2010), *with United States v. Cain*, 583 F.3d 408, 419–24 (6th Cir. 2009), *and United States v. Valverde*, No. 09-10063, 2010 WL 5263142, at *7–8 (9th Cir. Dec. 27, 2010).

[85] *Carr v. United States*, 130 S. Ct. 2229, 2234 n.2 (2010).

[86] 5 U.S.C. § 706(2)(A); *see United States v. Garner*, 767 F.2d 104, 115–16 (5th Cir. 1985).

[87] *Garner*, 767 F.2d at 116 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).

No. 09-60823

is well established that the "good cause" exception to notice-and-comment should be "read narrowly in order to avoid providing agencies with an 'escape clause' from the requirements Congress prescribed."[88] In making our decision, we must rely only on the "basis articulated by the agency itself" at the time of the rulemaking.[89] "Post hoc explanations . . . are simply an inadequate basis for the exercise of substantive review of an administrative decision."[90]

Here, we do not find the Attorney General's reasons for bypassing the APA's notice-and-comment and thirty day provisions persuasive. The Attorney General asserted that "[d]elay in the implementation of this rule would impede the effective registration of . . . sex offenders and would impair immediate efforts to protect the public."[91] He argued that delayed implementation would result in more sex offenses by "sex offenders that could have been prevented had local authorities and the community been aware of their presence."[92] Yet the interim rule did not distribute new information to local authorities. Rather, it authorized the federal government to use SORNA to prosecute sex offenders already in violation of state registration laws. Local authorities could have

---

[88] *Garner*, 767 F.2d at 120; *see also New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) (holding that "various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced").

[89] *Garner*, 767 F.2d at 116–17; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The reviewing court . . . may not supply a reasoned basis for the agency's action that the agency itself has not given.") (internal quotation marks omitted).

[90] *Garner*, 767 F.2d at 117.

[91] 72 Fed. Reg. at 8896.

[92] *Id.* at 8896–97.

27

No. 09-60823

prosecuted most of these offenders before the rule.[93]  Moreover, Congress could have expressly waived the APA procedural requirements in SORNA if it feared those requirements would produce significant harm or excessive delay.[94] Congress balanced the costs and benefits of an immediately effective rule against a more deliberate rulemaking process, and it favored the latter.  Without good cause, we must enforce Congress's choice in favor of the traditional, deliberative rulemaking process.

This case differs from the circumstances in *American Transfer & Storage Co. v. Interstate Commerce Commission*, where we found the agency had good cause to bypass APA notice provisions.[95]  There, the Commission issued proposed interim rules responding to the Motor Carrier Act, which was "the most comprehensive piece of legislation affecting the surface non-rail transportation industry since 1935."[96]  Once the statute was enacted, the Commission could not continue operating as it had before.  To comply with the new law, the Commission issued interim regulations two days after the statute's enactment. These new rules allowed the Commission to conduct business in accordance with the law while final rules could be discussed.  Six months later, the Commission

---

[93] *See Gould*, 568 F.3d at 478–79 (Michael, J., dissenting) (describing the state law interactions with federal law, including Megan's Law, which gave the federal government prosecutorial authority similar to that of SORNA); *see also Valverde*, 2010 WL 5263142, at *8 ("'[T]he existence of stringent state and federal criminal sanctions on the books at the time the [interim] regulation was promulgated obviated the case for an emergency.'" (quoting *Dean*, 604 F.3d at 1283 (Wilson, J., concurring)) (second alteration in *Valverde*)).

[94] *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998).

[95] 719 F.2d 1283 (5th Cir. 1983).

[96] *Id.* at 1286.

28

issued its final rules, with some minor modifications based on post-promulgation comments.

In contrast to *American Transfer*, SORNA did not disable the Attorney General or the states from continuing existing sex offender registration policies. Moreover, the Commission in *American Transfer* promptly responded to the new legislation, publishing its interim regulations immediately after the statute was enacted and completing its notice-and-comment process in six months. Here, the Attorney General did not publish these "emergency" regulations until after SORNA had been in effect for seven months. Full notice-and-comment procedures could have been run in the time taken to issue the interim rules. As this court has held, the good cause exception should not be used "to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them."[97]

The Attorney General argued that foregoing notice and comment was "necessary to eliminate any possible uncertainty about the applicability of the Act's requirements" to pre-SORNA offenders.[98] However, "desire to provide immediate guidance, without more, does not suffice for good cause."[99] Moreover, the goal of reducing uncertainty is undercut by the request for post-promulgation comments, which could have resulted in a rule change. "[T]he possibility of an alteration to the interim rule after its promulgation *increases*

---

[97] *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979).

[98] 72 Fed. Reg. at 8896.

[99] *Cain*, 583 F.3d at 421 (quoting *Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979)) (internal quotation marks omitted).

No. 09-60823

rather than eliminates uncertainty."[100] Traditional notice-and-comment process with promptly promulgated final rules was the clearest path to clarify the Act.

Nor does accepting post-promulgation comments excuse compliance with APA procedures. We have previously found that parties will have a greater opportunity for influencing agency decision making if they participate at an early stage, "when the agency is more likely to give real consideration to alternative ideas."[101] If we allowed post-promulgation comments to suffice in this case, "we would make the provisions of § 553 virtually unenforceable."[102]

Lastly, the Attorney General's rule applied federal criminal liabilities to pre-enactment sex offenders. This is not a rule of minimal import. "Certainly, a criminal prosecution founded on an agency rule should be held to the strict letter of the APA."[103] The strict letter requires notice and comment unless there is good cause. Here, the Attorney General has not sufficiently stated that following APA procedures would have been "impracticable, unnecessary, or contrary to the public interest." He did not have good cause for failing to publish the rule thirty days before its effective date nor did good cause exist to bypass the notice-and-comment requirements.

---

[100] *Gould*, 568 F.3d at 479 (Michael, J., dissenting).

[101] *U.S. Steel*, 595 F.2d at 214.

[102] *Id.* at 215; *see also New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980). This conclusion is especially apt in the case before us, as the interim rule is identical to the current rule.

[103] *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989).

No. 09-60823

VII.

"In administrative law, as in federal civil and criminal litigation, there is a harmless error rule."[104]    The APA demands that courts reviewing agency decisions under the Act "[take] due account . . . of the rule of prejudicial error."[105] In this circuit, an administrative body's APA deficiency is not prejudicial "only 'when [it] is one that clearly had no bearing on the procedure used or the substance of decision reached.'"[106]  Determining whether an APA deficiency is harmless demands a case-specific inquiry involving "an estimation of the likelihood that the result would have been different, . . . and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference."[107] Here, the Attorney General's regulations failed to comply with two separate APA procedures—publishing the rule at least thirty days before the effective date and following notice-and-comment procedures prior to promulgation.  We find both errors to be harmless in the particular circumstances of this case.

If the effective date of the interim rule had been in compliance with the APA's thirty-day notice provision, the rule would have been effective on March 30, 2007.  If Johnson engaged in interstate travel and failed to register after that date, his actions would properly violate the rule regardless of whether the

---

[104] *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659–60 (2007) (quoting *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004)).

[105] 5 U.S.C. § 706.

[106] *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (quoting *Braniff Airways, Inc. v. C.A.B.*, 379 F.2d 453, 466 (D.C. Cir. 1967)).

[107] *Shinseki v. Sanders*, 129 S. Ct. 1696, 1707 (2009).

No. 09-60823

Attorney General had good cause to bypass the thirty-day notice. Here, Johnson traveled across state lines in January 2008. He was not indicted until January 22, 2009. Even if the Attorney General lacked good cause to waive § 553(d), Johnson was not prejudiced.

Whether Johnson was prejudiced by the lack of notice-and-comment period does not yield so quick an answer. In *United States Steel Corp. v. EPA*, we held that to apply harmless error it must be clear that the petitioner was not prejudiced by APA deficiencies.[108] There, the EPA failed to provide notice-and-comment for air-quality regulations limiting Alabama steel plants' expansion opportunities. The EPA only provided for post-promulgation comments. We held that post-promulgation comments were an inadequate substitute for APA procedures. Moreover, the agency did not have good cause to bypass notice-and-comment nor could it rely on harmless error, as we could not assume the petitioners were not prejudiced.

*U.S. Steel* did not, however, preclude inquiry into whether petitioners were prejudiced by an agency's procedure, nor did it assert that an error affecting procedure could never be harmless. Rather, a court must determine whether it is clear that the lack of notice and comment did not prejudice the petitioner.

The purpose of notice-and-comment rulemaking is to "assure[] fairness and mature consideration of rules having a substantial impact on those regulated."[109] The process allows the agency to "educate itself before adopting a final order."[110] In addition, public notice requires the agency to disclose its thinking on matters

---

[108] 595 F.2d at 215.

[109] *Pennzoil Co. v. Fed. Energy Regulatory Comm'n*, 645 F.2d 360, 371 (5th Cir. 1981).

[110] *Id.*

No. 09-60823

that will affect regulated parties.[111]  These goals, however, may be achieved in cases where the agency's decision-making process "centered on the identical substantive claims"[112] as those proposed by the party asserting error, even if there were APA deficiencies.  It follows that when a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced.[113]

An overreaching harmless error doctrine would allow the agency to inappropriately "avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, [the agency] would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review."[114]  These concerns support the limited role of the harmless error doctrine in administrative law.[115]  With respect to SORNA, we can be confident that Johnson was not prejudiced by the Attorney General's failure to provide notice, in part because the interim rule publication addressed counter-arguments and set forth the basis and purpose of the rule.

While the Attorney General's preamble to the interim rule did not articulate good cause for avoiding APA rulemaking procedures, it did thoroughly engage the issues and challenges inherent in the regulation.  Public comment is

---

[111] *See United States v. Dean*, 604 F.3d 1275, 1278 (11th Cir. 2010).

[112] *Friends of Iwo Jima v. Nat'l Capital Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999).

[113] *Id.*

[114] *Sugar Cane Growers Co-Op of Fl. v. Veneman*, 289 F.3d 89, 96–97 (D.C. Cir. 2002).

[115] *See U.S. Steel*, 595 F.2d at 215.

preferred and ordinarily is required to draw out counter-arguments. Here, the Attorney General was able to address objections in the interim rulemaking itself. After the statute was enacted but before the rule was issued, the Attorney General believed he had authority to prosecute pre-enactment offenders for failing to register. While we have disagreed with the Attorney General's interpretation of SORNA, in the course of those prosecutions, defense counsel for various defendants argued that SORNA should not apply retroactively[116]—the same argument Johnson makes here. The Attorney General considered those arguments and responded to them in his preamble to the interim rule, stating that the rule was being issued because sex offenders with pre-enactment convictions had "devise[d] arguments that SORNA [was] inapplicable to them."[117] He rejected those arguments, concluding that principles of ex post facto were not apt because the registration requirements were non-punitive regulatory measures. Further, the preamble noted that failing to include pre-enactment offenders under SORNA "would thwart the legislative objective."[118] Thus, the error in failing to solicit public comment before issuing the rule was not prejudicial because the Attorney General nevertheless considered the arguments Johnson has asserted and responded to those arguments during the

---

[116] *See, e.g.*, *United States v. Madera*, 528 F.3d 852, 854 (11th Cir. 2008) (describing the facts of the case and noting that the defendant moved from New York to Florida in June 2006—prior to the enactment of SORNA, and was arrested for violating SORNA in October 2006—prior to the issuance of the Attorney General's interim rule). One month before the Attorney General issued his interim rule, the district court in *Madera* held that SORNA on its face was retroactive. Madera challenged his conviction on the grounds that the Attorney General's rule was a "condition precedent" to SORNA's retroactive enforcement. *Id.* at 856–57.

[117] 72 Fed. Reg. 8894, 8896 (Feb. 28, 2007).

[118] *Id.* at 8897.

No. 09-60823

interim rulemaking. There is no suggestion that, if given the opportunity to comment, Johnson would have presented an argument the Attorney General did not consider in issuing the interim rule.

Other circumstances present also point to harmless error. For example, unlike the complex regulatory decision of air-quality designations addressed in *U.S. Steel*, the Attorney General's interim rulemaking here involved a yes or no decision—whether or not to apply SORNA's registration requirements to pre-enactment offenders. This rulemaking starkly contrasts with the vast majority of agency rulemaking, which produces nuanced and detailed regulations that greatly benefit from expert and regulated entity participation.[119] Under those conditions, a finding of harmless error for inadequate notice-and-comment procedures may be rare, but as the Supreme Court has instructed, we should be hesitant to generalize results based on the kind of error. Instead we must focus on the factual circumstances that point to the proper outcome.[120] Given the binary decision made by the Attorney General, harmless error is more fitting under these circumstances than in other agency rulemaking.

Moreover, that the final rulemaking process with full APA comment did not change the Attorney General's decision cannot be ignored.[121] Although it is

---

[119] *See United States v. Dean*, 604 F.3d 1275, 1288–89 (11th Cir. 2010) (Wilson, J., concurring). The initial rulemaking also contrasts with the Attorney General's later SORNA rulemaking that delved into more detailed provisions and applications.

[120] *Shinseki*, 129 S. Ct. at 1707.

[121] This court continues to recognize the limitations of post-promulgation comments, as such comments do not ensure affected parties have an opportunity to influence agency decision-making at an early stage. *See U.S. Steel*, 595 F.2d at 214. Johnson's case is unique because his views were represented in the prosecutions that took place well before the interim rule was published. Those views were reiterated during the comment period offered for the final regulations and remained unpersuasive.

35

No. 09-60823

not completely clear that the later invitation for comment extended to retroactivity as a free-standing issue, that rulemaking process did include retroactivity as part of its regulatory package. The comments received on retroactivity did not sway the Attorney General. Rather, the position of the earlier interim final rule was incorporated into the final publication of the full guidelines promulgated in July 2008.

Finally, Johnson neither proposes comments he would have made during a comment period nor did he choose to involve himself in the post-promulgation comment period. Johnson does not allege that he participated in the Attorney General's subsequent rulemaking process that crafted regulations regarding the more detailed provisions of SORNA, in which the Attorney General also considered the retroactivity of SORNA, free of APA error.[122] While Johnson's participation in these alternate comment forums is not required to find prejudice, his lack of involvement in all stages of administrative decision-making points to the conclusion that Johnson was not practically harmed by the Attorney General's APA failings.[123] Moreover, Johnson had constructive notice that the Attorney General would apply SORNA to pre-enactment offenders when the Attorney General issued a *Federal Register* notice for the later rulemaking in May 2007,[124] before Johnson crossed interstate lines and failed to register.

---

[122] *See* 73 Fed. Reg. 38,030, 38,036 (July 2, 2008). In response to comments about retroactivity, the Attorney General stated that "no changes have been made in the final guidelines relating to retroactivity based on comments alleging an adverse effect on sex offenders."

[123] *See Air Transp. Ass'n of Amer. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 n.11 (D.C. Cir. 1984).

[124] *See* 72 Fed. Reg. 30,210, 30,212 (May 30, 2007) ("SORNA's requirements apply to all sex offenders, including those whose convictions predate the enactment of the Act." (citing 28

No. 09-60823

In *U.S. Steel*, we held that absence of prejudice "must be clear" before applying harmless error.[125] Because the Attorney General's rulemaking process addressed the same issues raised by Johnson and because Johnson "makes no showing that the outcome of the process would have differed . . . had notice been at its meticulous best,"[126] we find it is clear that the Attorney General's APA violations were harmless error.[127]

## VIII.

For the reasons stated above, we AFFIRM Johnson's conviction.

---

C.F.R. pt. 72)); *cf. Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85 (1947) ("Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.").

[125] 595 F.2d at 215.

[126] *Friends of Iwo Jima*, 176 F.3d at 774.

[127] In so holding, we recognize that our interpretation of SORNA is a position not previously held by the majority in another circuit. *Cf. Dean*, 604 F.3d at 1288 (Wilson, J., concurring) (endorsing the harmless error doctrine's applicability to SORNA).