**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
——————————

No. 08-4747
——————————

UNITED STATES OF AMERICA
v.

BILLY JOE REYNOLDS,
Appellant

——————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-07-cr-00412-001
District Judge: The Honorable Donetta W. Ambrose

Argued November 13, 2012
upon Remand from the Supreme Court
of the United States

Before: SMITH, FISHER, and STAPLETON,
*Circuit Judges*

(Filed: March 14, 2013)

Donovan J. Cocas     ARGUED
Robert L. Eberhardt
Laura S. Irwin
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA  15219
      *Counsel for Appellee*

Candace Cain
Lisa B. Freeland     ARGUED
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA  15222
      *Counsel for Appellant*

—————————————

OPINION

—————————————

SMITH, *Circuit Judge.*

This case returns to us after the Supreme Court's review in *Reynolds v. United States*, 132 S. Ct. 975 (2012). Remand requires that we reach the merits of Reynolds's claim that the regulatory rule upon which his

2

indictment was based was promulgated in violation of the Administrative Procedure Act ("APA"). This claim gives rise to three questions: (1) What is the appropriate standard of review of an agency's assertion of good cause in waiving the APA's notice and comment requirements? (2) Did the Attorney General have good cause to waive these requirements in promulgating a rule governing the retroactivity of the Sex Offender and Registration Notification Act's ("SORNA") registration requirements? (3) If the Attorney General lacked good cause to waive the requirements, was Reynolds prejudiced by the failure to comply with the APA's notice and comment requirements?

The courts of appeals are divided on each of these questions. On the first question, the Fifth and Eleventh Circuits have determined that the arbitrary and capricious standard is the appropriate standard for reviewing the Attorney General's actions, the Fourth and Sixth Circuits have not stated a standard but appear to use *de novo* review, and the Ninth Circuit has explicitly avoided the question.[1] On the second question, the Fourth and

---

[1] *Compare United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (arbitrary and capricious); *United States v. Dean*, 604 F.3d 1275, 1278 (11th Cir. 2010) (same), with *United States v. Gould*, 568 F.3d 459, 469–70 (4th Cir. 2009) (unstated, appears *de novo*); *United States v. Cain*, 583 F.3d 408, 419–23 (6th Cir. 2009) (same), with

Eleventh Circuits have held that the Attorney General had good cause to waive notice and comment, while the Fifth, Sixth, and Ninth Circuits have held that he did not.[2] On the final question, the Fifth Circuit has held that the Attorney General's lack of good cause does not prejudice defendants, while the Sixth Circuit has held that it is prejudicial.[3]

We conclude that we need not decide the appropriate standard of review today because the

---

*United States v. Valverde*, 628 F.3d 1159, 1162 (9th Cir. 2010) (explicitly avoids question).

[2] *Compare Gould*, 568 F.3d at 470; *Dean*, 604 F.3d at 1281–82, with *Johnson*, 632 F.3d at 928; *Valverde*, 628 F.3d at 1165–66; *Cain*, 583 F.3d at 422–24.

[3] *Compare Johnson*, 632 F.3d at 930–32; *Dean*, 604 F.3d at 1288–89 (Wilson, J. concurring), with *United States v. Utesch*, 596 F.3d 302, 312–13 (6th Cir. 2010).

The Seventh Circuit has joined the Fourth, Fifth, and Eleventh Circuits in upholding the Interim Rule, but the basis for its conclusion is unclear. *United States v. Dixon*, 551 F.3d 578, 583 (7th Cir. 2008) (dismissing a defendant's "frivolous" APA challenge to the Interim Rule in a parenthetical).

Attorney General's assertion of good cause cannot withstand review even under the most deferential standard available. We also conclude that the Attorney General's lack of good cause is prejudicial to Reynolds. Accordingly, we will vacate Reynolds' conviction.

I

In 2001, Reynolds was convicted of sexually assaulting a seven-year-old girl in Missouri. This conviction required him to register as a sex offender, which he did for the next six years. Meanwhile, Congress passed SORNA in 2006, which required individuals convicted of sex offenses after its enactment to comply with certain registration requirements. Through the promulgation of an administrative rule on February 28, 2007, the Attorney General made SORNA's registration requirements retroactive to those convicted of sex offenses before its enactment—i.e., sexual offenders such as Reynolds.

On September 16, 2007, Reynolds moved to Washington, Pennsylvania. He failed both to update his place of residence and employment information in Missouri and to register as a sex offender in Pennsylvania. Police discovered these registration violations on October 16, 2007, when Reynolds was arrested for violating parole. He was subsequently indicted for violating SORNA's registration requirements

5

because of his failure to register between September 16, 2007 and October 16, 2007. He pleaded guilty, reserving his right to appeal. He was sentenced to eighteen months of imprisonment to be followed by three years of supervised release.

A.    Procedural History

Reynolds's primary challenge to his conviction has been to its legal basis. In the District Court, he moved to dismiss the indictment, arguing that SORNA violated the nondelegation doctrine, the Commerce Clause, the Ex Post Facto Clause, the Tenth Amendment, and his Fifth Amendment substantive and procedural due process rights. Finally, he argued that even if SORNA did not violate the Constitution, his indictment should be dismissed because it was based on an administrative rule promulgated by the Attorney General that did not comply with the requirements of the APA. The District Court rejected each of these arguments and denied his motion to dismiss the indictment. Reynolds subsequently entered into a plea agreement that specifically reserved his right to appeal those issues argued in his motion to dismiss the indictment.

In his first appeal to this Court following his guilty plea, Reynolds presented these same arguments. Bound by *United States v. Shenandoah*, 595 F.3d 151 (3d Cir.

2010),[4] we upheld the District Court because the

[4] *Shenandoah* was decided by a different panel of this Court shortly before this panel's first decision in this case. The defendant in *Shenandoah* asserted the same arguments (plus an additional one based on the right to travel) brought by Reynolds in his first appeal to this panel: "that SORNA violated the Non-Delegation Doctrine, the Administrative Procedure Act, the *Ex Post Facto* Clause, the Due Process Clause, the Commerce Clause, the Tenth Amendment and his right to travel." 595 F.3d at 154. The *Shenandoah* panel rejected the *Ex Post Facto* Clause, Due Process Clause, Commerce Clause, and right to travel claims on their merits, *id.* at 158–61, 162–63, and held that the defendant lacked standing to make the nondelegation doctrine, APA, and Tenth Amendment claims, *id.* at 161–62, 163–64.

Central to *Shenandoah*'s holding that the defendant lacked standing for his nondelegation and APA claims was its interpretation of SORNA—namely that SORNA's registration requirements applied to pre-SORNA sex offenders automatically, without any action needed by the Attorney General. This understanding of SORNA made the administrative rule challenged by the defendant irrelevant to his case, in that SORNA, rather than the rule, was the basis of his conviction. *Id.* at 157–58, 163–64. This understanding of SORNA was rejected

Commerce Clause, Ex Post Facto, and Fifth Amendment arguments lacked merit and because Reynolds lacked standing to assert his APA, nondelegation, and Tenth Amendment arguments. *United States v. Reynolds*, 380 Fed. App'x 125, 126 (3d Cir. 2010); *see also Shenandoah*, 595 F.3d at 158–64. Reynolds filed a petition for writ of certiorari with the Supreme Court that requested review of these holdings. Pet. Writ Cert. at i, *Reynolds v. United States* (No. 10-6549), 2010 WL 5624498. The Supreme Court granted the petition limited to the question of whether Reynolds had standing to assert his APA and nondelegation arguments. *Reynolds v. United States*, 131 S. Ct. 1043 (2011). The Court reversed, holding that he did have standing to make those arguments. *Reynolds v. United States*, 132 S. Ct. 975, 978

---

by the Supreme Court in its *Reynolds* decision. *Reynolds v. United States*, 132 S. Ct. 975, 978 (2012).

The defendant lacked standing to raise his Tenth Amendment claim because, at the time of the decision, private parties were thought to be unable to assert Tenth Amendment claims absent the involvement of a State. *Id*. at 161–62. This holding was rejected by the Supreme Court in *Bond v. United States*, 131 S. Ct. 2355 (2011). In that case, the Supreme Court held that private persons may assert Tenth Amendment arguments even when an apparatus of the State is not a party to the suit. *Id*. at 2360, 2367.

8

(2012).

In reversing, the Supreme Court rejected this Court's interpretation in *Shenandoah* of the power delegated to the Attorney General by SORNA's registration requirement. 42 U.S.C. § 16913(d) ("The Attorney General shall have the authority to specify the applicability of the [registration] requirements . . . to sex offenders convicted before the enactment of this chapter . . . , and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)."); 42 U.S.C. § 16913(b) (providing when sex offenders other than those who had already completed their sentences should initially register).[5] In *Shenandoah*, this Court concluded that this provision automatically made SORNA's registration requirements applicable without any action by the Attorney General to sex offenders who

---

[5] 42 U.S.C. § 16913(b) provides that

> [t]he sex offender shall initially register (1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or (2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.

had been convicted before SORNA was enacted and who had already completed their prison sentences. 595 F.3d at 158. This meant that Reynolds's obligation to register under SORNA was derived from the Act itself and not from the administrative rule promulgated by the Attorney General. Accordingly, *Shenandoah* required us to conclude that he could not challenge the legality of the administrative rule because the statute, not the rule, was the basis of his conviction. *Reynolds*, 380 Fed. App'x at 126; *Shenandoah*, 595 F.3d at 163–64.

The Supreme Court interpreted § 16913 otherwise. The Court held that the registration requirement did not automatically apply retroactively to sex offenders who committed their offense before SORNA was enacted. Instead, the Court explained that under § 16913, "the Act's registration requirements do not apply to pre-Act offenders until the Attorney General specifies that they do apply." *Reynolds*, 132 S. Ct. at 978. This means, contrary to this Court's previous holding, that Reynolds's obligation to register under SORNA does not derive from the Act itself but from the administrative rule promulgated by the Attorney General. We must now reach the merits of the claim Reynolds raises challenging the legality of that rule. *Reynolds*, 132 S. Ct. at 984 ("Whether the Attorney General's Interim Rule sets forth a valid specification consequently matters in the case

10

before us.").[6]

B.     Administrative History

At issue here is the Attorney General's February 28, 2007 Interim Rule that made SORNA's registration requirements retroactive for all pre-SORNA offenders. Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894-01, 8897 (Feb. 28, 2007) [hereinafter "Interim Rule"]. The Attorney General issued this Interim Rule seven months after SORNA delegated authority to him to make SORNA retroactive. The Attorney General did not provide the period for notice and comment required under 5 U.S.C. § 553(b), nor did he provide the minimum thirty-day delay before the rule became effective under 5 U.S.C. § 553(d)(3). Instead, he concluded that notice and comment were not required because "good cause" existed pursuant to 5 U.S.C. § 553(b)(B) and that requiring those procedures

---

[6] As we noted in footnote 4, our previous holding that Reynolds lacked standing to assert his Tenth Amendment challenge has also been overruled by the Supreme Court's decision in *Bond*, 131 S. Ct. 2355. We acknowledge that Reynolds now has standing to raise a Tenth Amendment argument but decline to reach the issue because we conclude that the Attorney General failed to promulgate the rule in accordance with the APA.

would be "contrary to the public interest." Interim Rule, 72 Fed. Reg. at 8896–97 (citing 5 U.S.C. § 553(b)(B)). He provided the following reasons to support his finding of good cause:

> The immediate effectiveness of this rule is necessary to eliminate any possible uncertainty about the applicability of the Act's requirements—and related means of enforcement, including criminal liability under 18 U.S.C. 2250 for sex offenders who knowingly fail to register as required—to sex offenders whose predicate convictions predate the enactment of SORNA. Delay in the implementation of this rule would impede the effective registration of such sex offenders and would impair immediate efforts to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions. The resulting practical dangers include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders that could have been prevented had local authorities and the community been aware of their presence, in addition to greater difficulty in apprehending perpetrators who have not been registered and tracked as

12

provided by SORNA. This would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

*Id*. Finally, the Interim Rule allowed comments to be submitted for two months after promulgation. *Id*. at 8894.

Three months after the Interim Rule took effect, the Attorney General issued Proposed Guidelines for the interpretation and implementation of SORNA. The National Guidelines for Sex Offender Registration and Notification, 72 Fed. Reg. 30210-01, 30210 (proposed May 30, 2007) [hereinafter "Proposed Guidelines"]. These Proposed Guidelines included the proposed final rule governing SORNA's retroactivity to pre-Act offenders. It also solicited comments on all of the guidelines' proposals, which were due August 1, 2007. *Id*. at 30210, 30212–13, 30228–29. Thirteen months after issuing the Proposed Guidelines, the Attorney General promulgated the Final Rule. It was a reiteration of the same rule set out in the Interim Rule regarding

13

retroactivity. The National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38030-01, 38030, 38046–47 (July 2, 2008) [hereinafter "Final Rule"].[7]

## II

Reynolds's conviction is based on the Interim Rule because the conduct alleged in the indictment occurred from September 16, 2007 to October 16, 2007, approximately ten months before the Final Rule went into effect. Reynolds challenges the validity of the Interim Rule on two grounds. First, he argues that the

---

[7] We describe this regulation as the Final Rule because the parties have presented it as such. But our description is not intended to express our view on whether this 2008 action or a later action in 2010 actually finalized the Interim Rule. *See* Final Rule, 73 Fed. Reg. at 38030; Applicability of the Sex Offender Registration and Notification Act, 75 Fed. Reg. 81849-01, 81850 (Dec. 29, 2010) [hereinafter "2010 Final Rule"]. Accordingly, our description of the 2008 guidelines as the Final Rule should not be interpreted to endorse the view that the 2008 action created binding rules. The Attorney General appears to do just that in relation to the Sixth Circuit's use of the same language in *United States v. Utesch*, 596 F.3d 302 (6th Cir. 2010). 2010 Final Rule, 75 Fed. Reg. at 81850 (citing *Utesch*, 596 F.3d at 310–11).

Attorney General did not have "good cause" under the APA to waive its procedural requirements. Second, he argues that Congress' delegation to the Attorney General of the authority to make SORNA retroactive is an unconstitutional delegation. Because we conclude that the Attorney General did not provide sufficient justification for his finding of good cause and that this error prejudiced Reynolds, we do not reach Reynolds's nondelegation argument.

Our jurisdiction to hear this case is provided by 28 U.S.C. § 1291, while the District Court's jurisdiction was provided by 18 U.S.C. § 3231. Our standard of review for a district court's denial of a motion to dismiss an indictment is mixed. We review *de novo* a district court's legal conclusions and a district court's factual determinations for clear error. *United States v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir. 1998). Reynolds challenges the District Court's legal conclusions only, so we apply the *de novo* standard.

A.    Standard of Review

We must consider the parties' dispute over our standard of review for an administrative agency's assertion of good cause under § 553(b)(B) of the APA before deciding if good cause existed. The parties and our prior decisions provide three possible standards: *de novo*, mixed, and arbitrary and capricious. Reynolds

15

argues that the appropriate standard is *de novo* under 5 U.S.C. § 706(2)(D), while the Attorney General argues for arbitrary and capricious review under 5 U.S.C. § 706(2)(A).[8] Supporting the government's position are the Fifth and Eleventh Circuits' use of the arbitrary and capricious standard in their SORNA decisions. *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011); *United States v. Dean*, 604 F.3d 1275, 1278 (11th Cir. 2010). The arbitrary and capricious standard follows from § 706(2)(A)'s explicit inclusion of that standard as well as the provision's broader scope of review that

---

[8] The text of 5 U.S.C. §§ 706(2)(A) & (2)(D) is:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be:
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . .
>
> (D) without observance of procedure required by law.

16

allows for review of agencies' factual determinations. *Marsh*, 490 U.S. at 376; *Gardner v. Grandolsky*, 585 F.3d 786, 792 (3d Cir. 2009).

Supporting Reynolds's position are the Fourth and Sixth Circuits' application of *de novo* review, although these courts do not specifically state the standard they applied. *United States v. Gould*, 568 F.3d 459, 469–70 (4th Cir. 2009); *United States v. Cain*, 583 F.3d 408, 420–21 (6th Cir. 2009). *De novo* review follows from the limited scope of review provided to courts in § 706(2)(D) to ensure that agency actions, findings, and conclusions are completed in "observance of procedure required by law," 5 U.S.C. § 706(2)(D), which is a legal question for which *de novo* review would typically be utilized. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376–77 (1989); *Pierce v. Underwood*, 487 U.S. 552, 558 (1988). Each party's position, therefore, has support from other courts of appeals.

Notably, none of these decisions has extensively analyzed the standard of review question and only the Fifth and Ninth Circuits have directly linked their discussion of the standard to § 706. *Johnson*, 632 F.3d at 928 & n.86; *United States v. Valverde*, 628 F.3d 1159, 1162 (9th Cir. 2010). For its part, the Ninth Circuit chose not to decide what standard should be applied. *Valverde*, 628 F.3d at 1162. What the appropriate standard is, therefore, has not received in-depth analysis despite the

disagreement on the ultimate conclusion. For that reason, we will take up where those courts left off.

The ambiguity created by the foregoing disagreement is heightened by the absence of an expressed standard in many non-SORNA good cause decisions by courts of appeals. Instead, courts have resolved these cases by interpreting § 553's good cause provision with a limiting principle. This principle is most commonly formulated as a direction that "good cause" should be "narrowly construed." *Cain*, 583 F.3d at 420; *Gould*, 568 F.3d at 469; *Dean*, 604 F.3d at 1278; *Johnson*, 632 F.3d at 928 (explaining that good cause should be "read narrowly"); *Valverde*, 628 F.3d at 1164 (stating that notice and comment can be waived only in "narrow circumstances"). Some courts—including this one—have elaborated on this interpretive framework by explaining that "circumstances justifying reliance on the good cause exception are 'indeed rare' and will be accepted only after the court has examined closely proffered rationales justifying the elimination of public procedures." *Natural Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 764 (3d Cir. 1982) (quoting *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981)) (alterations and quotation marks omitted); *see also Mid-Tex Elec. Coop. v. Fed. Energy Regulatory Comm'n*, 822 F.2d 1123, 1132 (D.C. Cir. 1987) ("This court has cautioned that the § 553(b)(3)(B) exception should be narrowly construed and reluctantly

18

countenanced. That admonition means our inquiry should be a close one." (internal quotation marks and citations omitted)). This interpretive framework has been developed separate and apart from § 706, derived from the legislative history of the good cause exception. *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 291–92 (3d Cir. 1977).

Our application of this interpretive principle generally suggests that *de novo* review is the correct standard for examining claims of good cause under the APA. But the close examination required by *de novo* review, *Natural Res. Def. Council*, 683 F.2d at 764, is inconsistent with the deference afforded under the arbitrary and capricious standard. *See id*. at 760 ("The exacting standard applicable in determining whether an agency has failed to comply with the [APA's] procedural requirements [of notice and comment] for its action contrasts with the deferential standard applicable to substantive challenges to agency action.").

One of our decisions, however, is more ambivalent about whether narrow construction of good cause mandates *de novo* review exclusively. *Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877 (3d Cir. 1982), suggests that the narrow-construction limiting-principle can be applied consistently with arbitrary and capricious as well as *de novo* review through the use of a mixed standard. There, we reviewed *de novo* whether

19

"shortness of time can [ever] constitute good cause for invoking the [good cause] exemption" and whether the particular circumstances the department found itself in were indeed good cause. 669 F.2d at 883. We then employed arbitrary and capricious review for whether the agency was correct to conclude that "alternative procedure[s]" the agency could have utilized "were impracticable under the circumstances." *Id*. at 886.

*Schweiker*'s bifurcated analysis shows that the narrow-construction limiting-principle supports the third standard available—a mixed standard—consistent with both *de novo* and arbitrary and capricious review. This mixed standard requires that we review *de novo* whether the agency's asserted reason for waiver of notice and comment constitutes good cause, as well as whether the established facts reveal justifiable reliance on the reason. But any factual determinations made by the agency to support its proffered reason are subject to arbitrary and capricious review.

So while some of our good cause decisions—such as *Natural Resources Defense Council* and *Mobay*—suggest that *de novo* review is the appropriate standard in light of the narrow-construction limiting-principle, *Schweiker* suggests that this principle could also support mixed review. Clearly, our decisions are in tension with one another because similar procedural determinations afforded deference in *Schweiker* are afforded little or no

20

deference in *Natural Resources Defense Council* and *Mobay*. Fortunately, we need not abate that tension here because we conclude that the Attorney General's good cause determination will not pass muster under any of the available standards.

In summary, § 706 and our prior decisions provide us with three possible standards: *de novo*, mixed, and arbitrary and capricious. Selecting the appropriate standard gives rise to several difficult questions. The first is how to resolve the tension between *Schweiker* and our other good cause decisions. There is reason to doubt *Schweiker*'s use of mixed review because the decision appears to be an outlier from the body of good-cause case-law from this Court, as well as other courts of appeals.[9] Mixed review, however, is consistent with the

---

[9] This concern is only increased by the legal support *Schweiker* relies on for its inclusion of arbitrary and capricious review. The *Schweiker* Court cites to an *American Iron & Steel Institute v. EPA* decision that is different from the *American Iron & Steel* discussed in our good cause analysis here. The case *Schweiker* relies on for arbitrary and capricious review only addresses issues other than procedural defect. *Am. Iron & Steel Inst. v. EPA*, 526 F.2d 1027, 1035, 1042, 1045, 1047 (3d Cir. 1975) (analyzing arguments related to the EPA's power to promulgate the rule, the nature of that power, and the substance of the rule itself). Section 553's good cause

text of § 706 because it includes no requirement that only one provision of the section be applied to a particular review—the section allows us to apply one standard to legal determinations and another to factual determinations made in an administrative decision. This conformance with § 706 is important because of the Supreme Court's direction that "[t]he standards to be applied on review are governed by the provisions of § 706." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985); *Dickinson v. Zurko*, 527 U.S. 150, 154–55 (1999) ("[r]ecognizing the importance of maintaining a uniform approach to judicial review of administrative action" found in § 706 to hold that deviations from the standards "must be clear[ly]" established by statute or common law). This direction by the Court requires that any selection among the three standards be guided by a determination of what the respective scopes of § 706(2)(A) and (2)(D) are in relation to one another—a topic for which there is surprisingly little guidance.

We decline, for now, to resolve these questions. We conclude that the Attorney General's assertion of good cause fails even the most deferential standard of arbitrary and capricious. *Accord Valverde*, 628 F.3d

provision was not at issue in that decision. *Schweiker*'s reliance on it as informing a determination as to the standard that should be applied in good case cases is therefore questionable.

at 1162. Just what is the applicable standard of review for agency determinations that good cause justifies waiver of notice and comment is a question for another day.

B.    Good Cause

As with the standard of review, appellate courts are divided over whether the Attorney General's justifications are sufficient to support a good cause determination. The Fourth and Eleventh Circuits have concluded they are sufficient. *Gould*, 568 F.3d at 470; *Dean*, 604 F.3d at 1281–82. The Fifth, Sixth, and Ninth Circuits have held otherwise. *Johnson*, 632 F.3d at 928; *Cain*, 583 F.3d at 422–24; *Valverde*, 628 F.3d at 1165–66. We agree with the Fifth, Sixth, and Ninth Circuits that the two reasons provided in the Interim Rule are not sufficient to establish good cause because the Attorney General's reasons for good cause would eviscerate the APA's notice and comment requirements.[10]

---

[10] Having the benefit of further development on the good cause question, the Eleventh Circuit's conclusion is more developed than the Fourth Circuit's reasoning, which was the first offered on the good cause question. *Compare Dean*, 604 F.3d at 1281–82, with *Gould*, 568 F.3d at 470. We will thus focus on the Eleventh Circuit's rationale as setting forth the competing understanding with which we ultimately disagree.

23

Under the arbitrary and capricious standard, a court's scope of review is "narrow, and a court is not to substitute its judgment for that of the agency." *Gardner*, 585 F.3d at 790 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A] reviewing court may not supply a reasoned basis for the agency's action that the agency itself has not given," but it can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" from the record. *Id.* (quoting *State Farm*, 463 U.S. at 43). "[W]e reverse an agency's decision when it 'is not supported by substantial evidence, or the agency has made a clear error in judgment.'" *Prometheus Radio Project v. F.C.C.*, 373 F.3d 372, 390 (3d Cir. 2004) (quoting *AT&T Corp. v. F.C.C.*, 220 F.3d 607, 616 (D.C. Cir. 2000)). The Interim Rule cannot withstand review under this standard. The Attorney General's rationale is not supported by substantial evidence and constitutes a clear error of judgment because the logical extension of the bases offered to support it lacks a limiting principle.

Notice and comment may be waived "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Attorney General concluded that good cause existed because undergoing notice and comment for the Interim Rule would be

24

"contrary to the public interest," offering two reasons. Interim Rule, 72 Fed. Reg. at 8896–97. First, he asserted that there was a need to immediately "eliminate any possible uncertainty" whether SORNA applied retroactively. *Id*. Second, he contended that waiver was necessary in order to "protect the public from sex offenders who fail to register" and thereby create "practical dangers," including "the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders." *Id*. We discuss each reason in turn.

The desire to eliminate uncertainty, by itself, cannot constitute good cause. To hold otherwise would have the effect of writing the notice and comment requirements out of the statute. The Attorney General states in the Interim Rule that waiver is needed in order to eliminate "*any* possible uncertainty" in regard to the retroactive application of SORNA's registration requirements. Interim Rule, 72 Fed. Reg. at 8896 (emphasis added); *see also Dean*, 604 F.3d at 1280 (stating that the Interim Rule's "guidance rationale is particularly important here as the persons who were affected by the rule were already convicted of their prior crimes and need to know whether to register"). This rationale cannot serve as a basis for good cause because some uncertainty follows the enactment of any law that provides an agency with administrative responsibility. Uncertainty exists because the actual substantive rules

that will eventually result from the delegation are uncertain until the agency invokes its power to promulgate a rule or define the scope of its authority. Consequently, if elimination of uncertainty were sufficient to show good cause, then no rule would require notice and comment. *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975). An agency's intention to provide clarity, without more, cannot amount to good cause.

Further undermining the uncertainty rationale is that the elimination of notice and comment, with the simultaneous request for postpromulgation comments, does not achieve the stated goal of eliminating "any" uncertainty. Requesting comments on the Interim Rule implicitly suggests that the rule will be reconsidered and possibly changed in light of these comments. But that means the level of uncertainty is, at best, unchanged, and possibly enhanced because parties do not view the Interim Rule as the final version. *Johnson*, 632 F.3d at 929 ("[T]he goal of reducing uncertainty is undercut by the quest for post-promulgation comments, which could have changed the rule."); *Gould*, 568 F.3d at 479 (Michael, J., dissenting) ("[T]he possibility of an alteration to the interim rule after its promulgation *increases* rather than eliminates uncertainty." (emphasis in original)). Accordingly, if the Attorney General intended to eliminate "any possible uncertainty," the best course to have taken would have been to provide for

notice and comment at the start and later issue a final rule. His choice not to follow this path undermines his stated justification of eliminating uncertainty.

The Government argues that the limiting principle to its uncertainty justification is the unique necessity of the Interim Rule. Urgent action was required, according to the Attorney General, to ensure that "SORNA would be *enforceable at all* as to sex offenders convicted before July 27, 2006 [the Act's effective date]." Gov't Suppl. Br. at 19 (emphasis in original). This reasoning is unpersuasive for several reasons. First, this argument assumes that retroactivity was the necessary conclusion of the Attorney General's rulemaking—an assumption that is contrary to the very purpose of notice and comment for agencies to "maintain[] a flexible and open-minded attitude towards its own rules." *Prometheus Radio Project*, 652 F.3d at 449. Second, a need to regulate affected parties does not create the urgency necessary to establish good cause. Our prior decisions have recognized urgency alone as sufficient only when a deadline imposed by Congress, the executive, or the judiciary requires agency action in a timespan that is too short to provide a notice and comment period. *See, e.g.*, *Schweiker*, 669 F.2d at 883 (concluding there was good cause when Congress provided only forty-nine days to issue comprehensive rules); *Am. Iron & Steel*, 568 F.2d at 292 (concluding there was no good cause when the agency had at least three months to promulgate the

regulations at issue). Here, there is no deadline imposed by SORNA on the Attorney General other than, perhaps, its provision that SORNA's predecessor statute would remain in effect for three years. SORNA §§ 124(a), 129(b); 42 U.S.C. § 16924. Three years is hardly the deadline of mere days we found to be adequate for good cause in *Schweiker*. 669 F.2d at 883. The government's urgency rationale cannot be said to follow from our previous urgency cases.

Because no externally-imposed deadline created urgency, the Government's urgency argument must rest on the notion that the nature of sex offenses warrants good cause. This may be, to some, an appealing intuition but it lacks a basis in law. Indeed, if there is any presumption when it comes to questions of good cause in criminal cases, we agree with the D.C. Circuit that "a criminal prosecution founded on an agency rule should be held to the strict letter of the APA." *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989); *accord Cain*, 583 F.3d at 422; *Johnson*, 632 F.3d at 930. The liberty interest at stake is greater than the ordinary civil interests litigated in administrative cases. This forecloses our adoption of the Government's position that notice and comment are somehow less important in criminal cases, and thus easier to waive for good cause, because the procedural delay allows criminal harm to continue during the time required to comply with the APA. If Congress had decided that the harm from delay was too

28

great to warrant notice and comment, it could have statutorily dispensed with the APA requirements or made SORNA's registration requirements retroactive on its own. *Reynolds*, 132 S. Ct. at 981–82. Congress chose not to. In light of the subject matter of the Act, Congress' failure to address the effective date cannot serve as a basis for finding good cause on the basis of urgency.

The Government posits that rejecting its uncertainty argument "would mean that an agency's perception of urgency *never* could satisfy 5 U.S.C. § 553(b)(B) because *every* delegation entails some delay." Gov't Suppl. Br. at 21 (emphasis in original). The only rule we establish today is that "an agency's perception of urgency" *alone* is not sufficient to satisfy § 553(b)(B)'s good cause exception. Section 553(b)(B) allows waiver only if notice and comment are "impracticable, unnecessary, or contrary to public interest." 5 U.S.C. § 553(b)(B). Urgency for urgency's sake, or "an agency's perception of urgency," without any supporting evidence, is not among those situations identified by the statute. As with any other administrative agency conclusion, we require some statement of facts or circumstances that justifies the existence of good cause (e.g. an imminent, externally imposed deadline or the existence of an emergency). *See, e.g.*, *Schweiker*, 669 F.2d at 883; *Haw. Helicopter Operators Ass'n v. F.A.A.*, 51 F.3d 212, 214 (9th Cir. 1995) (concluding the FAA had good cause when a series of accidents occurred after

Congress passed the relevant legislation showed a need for urgent action); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) (concluding there was good cause where notice of the rule would have resulted in market-distorting behavior). The Interim Rule lacks such facts or justification and thus cannot constitute a reasoned basis for good cause.

The Attorney General's second rationale, which the Eleventh and Fourth Circuits relied on most heavily, is that waiver of the notice and comment requirements were necessary in order to "protect the public from sex offenders who fail to register" thus creating "practical dangers," including "the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders." Interim Rule, 72 Fed. Reg. at 8896–97; *Dean*, 604 F.3d at 1281–82; *Gould*, 568 F.3d at 470. This rationale relies on the D.C. Circuit's explanation that good cause can be found "where delay [from notice and comment] could result in serious harm." *Chambers of Commerce v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006). This public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.

Mere restatement of the public safety rationale offered in the statute cannot constitute good cause because it would allow agencies to circumvent the notice

and comment requirements. The statutory purpose of SORNA is "to protect the public from sex offenders and offenders against children." 42 U.S.C. § 16901. The Interim Rule's public safety rationale for good cause, in turn, is to reduce "practical dangers" to the public that "include the commission of additional sexual assaults and child sexual abuse or exploitation offenses by sex offenders." 72 Fed. Reg. at 8897–98. Yet this rationale does no more than iterate the harm that "sex offenders and offenders against children" represent. *Valverde*, 628 F.3d at 1167 ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress sought to prevent when it enacted SORNA on July 27, 2006."). Most, if not all, laws passed by Congress requiring agencies to promulgate new rules are designed to eliminate some real or perceived harm. If the mere assertion that such harm will continue while an agency gives notice and receives comments were enough to establish good cause, then notice and comment would always have to give way. An agency will invariably be able to point to some continuing harm during the notice and comment period antecedent to the promulgation of a rule. *Id*. at 1167–68. Indeed, one should not expect otherwise: if the statute did not address a perceived continuing harm, then Congress would not have legislated in the first place. The Attorney General's iteration of the very harm Congress legislated against cannot be sufficient justification for good cause.

31

In reaching the opposite conclusion, the Eleventh Circuit relied heavily on the D.C. Circuit's formulation that good cause may exist when notice and comment would result in "serious harm." *Dean*, 604 F.3d at 1281 (quoting *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)). We disagree that the public safety rationale offered in the record would result in "serious harm." Situations that fit within the serious harm justification for good cause require some set of facts and circumstances showing why the harm at issue demonstrates a need to waive the notice and comment requirements. In *Hawaii Helicopter Operators Ass'n v. F.A.A.*, for example, the FAA waived notice and comment after seven helicopter accidents occurred in the first nine months of 1994. 51 F.3d at 214. Based on these accidents, the FAA determined that there was "an urgent safety problem that [could not] be adequately addressed solely by enforcement of existing regulations." *Id.* The agency went on to provide other facts showing that the safety problem was ongoing and that accidents had dramatically increased in frequency in recent months. *Id.* (explaining that the agency showed there were twenty accidents from 1991 to 1994, seven of which occurred in the nine months before the rule was issued in late 1994). The Ninth Circuit held that this was sufficient to show good cause under § 553(b)(B). *Id. Hawaii Helicopter* thus shows what the Sixth and Ninth Circuits have alluded to: the serious harm justification for waiver requires agencies to point to something specific that illustrates a

32

particular harm that will be caused by the delay required for notice and comment. *Cain*, 583 F.3d at 422 ("[T]he Attorney General gave no *specific evidence* of actual harm . . ."); *Valverde*, 628 F.3d at 1167 (listing possible situations that might justify the need to waive notice and comment).

The D.C. Circuit's own application of its serious harm rationale confirms this specificity requirement. For example, in *Jifry v. F.A.A.*, 370 F.3d 1174 (D.C. Cir. 2004), the FAA relied on the serious harm justification to bypass notice and comment in issuing new regulations relating to the automatic suspension or revocation of alien pilots' licenses. *Id*. at 1179–80. The agency explained that waiver was necessary "in order to minimize security threats and potential security vulnerabilities to the fullest extent possible." *Id*. The *Jifry* Court found this rationale compelling because of the agency's "legitimate concern over the threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001." *Id*. That is, the circumstances arising from a specific situation—9/11 in this case— justified the waiver of notice and comment. *Jifry* and *Hawaii Helicopter*, therefore, show that an agency asserting the "serious harm" justification must state with specificity some facts and circumstances which demonstrate that a new regulation must be swiftly put in place.

33

This specificity requirement is little more than a demand that an agency comply with § 553(b)(B)'s language which requires within the rule "a brief statement of reasons" supporting why an agency wishes to waive notice and comment. 5 U.S.C. § 553(b)(B). The degree of specificity required is not great, as the FAA's reliance on September 11 in *Jifry* illustrates, but the reasons provided must demonstrate the need for a new regulation in a shorter-than-usual time span.

Here, the Interim Rule's mere restatement of the statute's public safety goal is hardly comparable to the specific facts or inferable reasons set forth in *Hawaii Helicopter* or *Jifry*. The Rule did not point to any event that would make a failure to immediately implement the rule especially harmful. We lack, for example, any factual support for the Rule's assertion that "additional" sex offenses will occur absent immediate rulemaking. We do not know whether the Attorney General was suggesting that there will be an increase in the frequency of these offenses, or simply that the existing harm which the underlying legislation sought to address will continue. Quite simply, the Interim Rule's explanations rely on nothing more than the nature of the harm being regulated to justify waiver. The Government's "serious harm" rationale does not constitute a reasoned basis for good cause.

The Eleventh Circuit's formulation of the "serious

34

harm" rationale in *Dean* to permit waiver for good cause whenever "delay would do real harm" only reinforces the need for a specificity requirement. *Dean*, 604 F.3d at 1281. All, or at least the vast majority of, regulations are designed to mitigate or eliminate some harm that is presumably real. The delay in promulgating any regulation will thus "do real harm" because it will allow the currently existing harm addressed by the statute to continue unabated during the notice and comment period. To avoid the good cause exemption swallowing up notice and comment requirements, a limiting principle is needed. *Hawaii Helicopter* and *Jifry* demonstrate that the Government must explain why the harm targeted by the regulation will worsen unless notice and comment is dispensed with.

Accordingly, the Eleventh Circuit's distinguishing of the Sixth and Ninth Circuits' reasoning on the basis that those cases limited good cause to emergency situations without recognizing the serious harm or real harm rationale does not convince us that the Interim Rule adequately set out good cause. *Dean*, 604 F.3d at 1281. Even were we to agree that the emergency rationale for good cause is distinct from the serious harm rationale—a distinction that is difficult to make in a meaningful way—the Attorney General must still explain why the harm caused by delay here is unique in a way that warrants dispensing with notice and comment. The Eleventh Circuit does not point to any such explanation

35

by the Attorney General, relying instead on the "practical" benefits obtained from retroactivity, such as the reduced risk of sex offenses by sex offenders and the increased ability to apprehend sex offenders who fail to register. *Id*. The absence of a citation to the Interim Rule in the Eleventh Circuit's explanation is telling and demonstrates the  weakness of the Attorney General's justification. *Id*.

We therefore hold that the Interim Rule did not provide sufficient justification to constitute good cause for the waiver of notice and comment.

C.     Prejudice

Our conclusion that the Attorney General lacked good cause to waive notice and comment does not end our analysis. The APA requires that "due account shall be taken of the rule of prejudicial error" when courts review agency actions. 5 U.S.C. § 706(F). This means that we must determine whether the agency's error is harmless. *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). The courts of appeals that have concluded that the Attorney General lacked good cause to waive notice and comment are divided over whether this error was harmless.[11] The Fifth Circuit has concluded that the

---

[11] Our prejudice analysis is limited to the Attorney General's lack of good cause to waive the notice and comment requirements found in § 553(b)–(c). We agree

36

Attorney General's error was harmless. *Johnson*, 632 F.3d at 930–32; *see also Dean*, 604 F.3d at 1288–89 (Wilson, J., concurring) (arguing that the *Dean* majority was incorrect in holding that the Attorney General had good cause but concurring on grounds that the error is harmless). The Sixth Circuit has concluded that the Attorney General's error was not harmless. *United States v. Utesch*, 596 F.3d 302, 312–13 (6th Cir. 2010). We agree with the Sixth Circuit, albeit for difference reasons. None of the courts of appeals have addressed how the criminal nature of the case before them affects the harmless error analysis. We conclude that this characteristic has important meaning because it shifts the burden of showing harmlessness onto the Government. It is a burden that the Government cannot meet here.

The Government bears the burden of showing that the failure to provide notice and comment was harmless because of the liberty interest at stake in a criminal proceeding. In *Sanders*, the Supreme Court interpreted a similar prejudice provision, 38 U.S.C. § 7261(b)(2), which provides that the Veterans Court must "take due

---

with the Fifth Circuit that Reynolds cannot argue he was prejudiced by the Attorney General's lack of good cause to waive the thirty-day notice requirement in § 553(d) because the alleged conduct in the indictment took place more than thirty days after the Interim Rule was promulgated. *Johnson*, 632 F.3d at 930.

account of the rule of prejudicial error." *Sanders*, 556 U.S. at 407. The Court treated § 7261(b)(2) and § 706 of the APA as identical in their incorporation of the harmless error rule. *Id*. Specifically, the Court explained that the language found in these provisions requires courts "to apply the same kind of 'harmless error' rule that courts ordinarily apply in civil cases" and that "the APA's reference to 'prejudicial error' [in § 706] is intended to 'sum up in succinct fashion the harmless error rule applied by the courts *in review of lower court decisions as well as of administrative bodies*.'" *Id*. (quoting Dept. of Justice, Attorney's general Manual on the Administrative Procedures Act 110 (1947)) (emphasis in original). This could be read to incorporate civil harmless-error review only, but the Court concluded that its review of the Federal Circuit's harmless error approach for review of the Veterans Court in *Sanders* would be conducted "in light of [the Court's] *general case law* governing application of the harmless error standard." *Id*. (emphasis added). Furthermore, the language in § 706 that incorporates the rule—"due account shall be taken of the rule of prejudicial error," 5 U.S.C. § 706—does not make a distinction between civil or criminal harmless error review. Instead, as the *Sanders* Court suggests by its review "in light of the general case law," the language of § 706 plainly incorporates the entire body of harmless error jurisprudence.

This incorporation is notable here because

harmless error doctrine distinguishes between civil and criminal matters in allocating the burden of proof. In civil matters, the "party seeking reversal normally must explain why the erroneous ruling caused harm." *Sanders*, 556 U.S. at 410. In criminal matters, however, the Government has the burden of proving that an error did not cause harm. *Id*. ("But we have placed [the burden to show error was harmless] on the appellee only when the matter underlying review was criminal."). The burden shifts in criminal matters because "the Government seeks to deprive an individual of his liberty, thereby providing good reason to require the Government to explain why an error should not upset the trial court's determination." *Id*. Here, Reynolds's liberty is at stake. Accordingly, the Government must bear the burden of showing that the failure to provide notice and comment did not cause harm.

The Government argues that this conclusion is erroneous because sex-offender registration-regimes like SORNA impose only civil penalties. *Smith v. Doe*, 538 U.S. 84, 105–06 (2003) (holding that a sex-offender registration-regime did not violate the Ex Post Facto Clause because it is a "civil regulatory scheme"); *United States v. Parks*, 698 F.3d 1, 6 (1st Cir. 2012) (applying the *Smith* rationale to reject an ex post facto argument against SORNA). These registration regimes are therefore civil ones for which, the Government argues, we would apply the harmless-error framework that we

39

apply in any other civil matter. This argument is similar to the Government's argument in *O'Neal v. McAninch*, 513 U.S. 432 (1995), that a petitioner requesting relief through the writ of habeas corpus must bear the burden of showing that errors were prejudicial because habeas proceedings are civil proceedings. *Id*. at 440. The Supreme Court rejected that argument on the basis that it "fail[ed] to take into account the stakes involved in a habeas proceeding." *Id*. As the Court explained, "although habeas is a civil proceeding, someone's custody, rather than mere civil liability, is at stake." For that reason, the petitioner did not have the burden of showing that the error was harmful. *Id*. *O'Neal* makes clear that the nature of the underlying statutory regime does not control our analysis. Instead, as seen in *Sanders* and *O'Neal*, the nature of the interests at stake in the proceeding before the court are determinative. The Government's reliance on the civil nature of SORNA's registration requirements to shift the burden to Reynolds is misguided.

The Government's task in carrying this burden is difficult here. The Attorney General chose to completely forego notice and comment; he did not merely commit some technical error in providing a notice and comment period. In the ordinary civil case, prejudice from the failure to comply with the notice and comment regime falls into two general categories. In the first category, the agency has provided some notification and method for

40

commenting but some technical failure in that process violates statutory requirements. *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003). In these "technical failure" cases, the party challenging the agency rule "may be required to demonstrate that, had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale" of the rule. *Id*. In the second category of cases, "the agency [has] entirely failed to comply with notice and comment requirements and the agency has offered no persuasive evidence that possible objections to its final rules have been given sufficient consideration." *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991). In these "complete failure" situations, the petitioner does not need to show that he would have offered comments that would have invalidated the rationale underlying the promulgated rule. *Id*.; *see also McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323–24 (D.C. Cir. 1988) (explaining that the "imposition of [ ] a burden [to show specific prejudice] on the challenger is normally inappropriate where the agency has completely failed to comply with § 553"). Instead, the "utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002). That means that, in civil cases, the party challenging the administrative rule has a heavier burden when the errors that have occurred in the process

41

are only technical as opposed to when the agency has completely failed to provide notice and comment.

This distinction between technical errors and complete procedural failures is a sensible one: it is driven by a concern that harmless error analysis could be used to eliminate the notice and comment requirements together with a recognition that the underlying purposes of § 553's requirements are often satisfied when the errors made are mere technical ones. As the D.C. and Ninth Circuits have explained, "if the government could skip [§ 553] procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated." *Sugar Cane Growers*, 289 F.3d at 96. This risk is genuine because "[a]n agency is not required to adopt a rule that conforms in any way to the comments presented to it." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992). So "if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with the APA procedures." *Id*. Accordingly, "[t]o avoid gutting the APA's procedural requirements, harmless error analysis in administrative rulemaking must [ ] focus on the process as well as the result." *Id*.

Focusing on the process has allowed courts to make a meaningful distinction between technical errors

42

and complete failures of notice and comment. Technical errors are often harmless absent a demonstration that the challenger would have made a comment to the rule not considered by the agency because these errors often do not prevent the purposes of notice and comment from being satisfied. *Id*. We have previously explained that "[a]mong the purposes of the APA's notice and comment requirements are '(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'" *Prometheus Radio Project*, 652 F.3d at 449 (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005)). "In addition, 'a chance to comment . . . [enables] the agency [to] maintain[] a flexible and open-minded attitude towards its own rules.'" *Id*. (quoting *McLouth Steel Prods.*, 838 F.2d at 1325). As part of achieving these purposes, "there must be an exchange of views, information, and criticism between interested persons and the agency." *Id*. (quoting *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)).

These purposes are often fulfilled despite the presence of technical errors. In *Riverbend Farms*, for example, the Secretary of Agriculture's weekly final rules that set quantity limitations on navel orange

production were challenged on procedural grounds. 958 F.2d at 1482–84. These final rules were reached in a two step process. First, there was an annual marketing policy that interested parties were notified about and given a chance to discuss at a public hearing that predicted the weekly restrictions. Second, there were weekly meetings during the growing season that growers were notified of and could comment on at a public meeting. The final recommendation for the appropriate restriction for the week was made after the meeting and became the Secretary's final rule. *Id*. at 1483. Although this process did not conform with § 553's requirements because the meetings were not publicized in the Federal Register and there was no opportunity for written comments, *id*. at 1485–87, the error was deemed harmless, *id*. at 1487. The parties had participated for decades in the rulemaking process used by the Secretary, and that process included notification to interested parties as well as consideration of comments received. *Id*. This, the court held, was determinative because it showed that the "purposes" of the notice requirement were fulfilled and that the process "afforded the public a full and fair opportunity to be heard." *Id*. (quoting *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 769 (9th Cir. 1986)). In short, the technical errors in the process used did not prevent the "exchange of views, information, and criticism between interested persons and the agency" which is the very essence of notice and comment requirements. This allowed the *Riverbend Farms* Court

44

to conclude that the errors were harmless.

These harmless technical errors stand in contrast to an agency's complete failure to comply with § 553's requirements. In those situations, the purposes of notice and comment often cannot be fulfilled because there has been no effort to have the kind of exchange of views and information the requirements are intended to generate. Without notice and comment, the regulations are not tested by public input nor do and interested parties have an opportunity to develop a record for judicial review. The lack of a record makes it very difficult for a reviewing court to "say with certainty whether petitioner's comments would have had some effect if they had been considered when the issue was open," even if we are not sure what those comments would have been. *McLouth Steel Prods.*, 838 F.2d at 1324. This doubt provides uncertainty "as to the effect of [the] failure," which means that courts are often hard-pressed to conclude that the failure has actually resulted in prejudice. *Sugar Cane Growers*, 289 F.3d at 96 ("[U]tter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure."). Courts, then, should be hesitant to conclude that complete failure to comply with § 553's requirements is harmless.

This is not to say that there is a presumption of harm when an agency does not provide notice and

comment—only that the nature of complete failure often results in courts' finding prejudice. Courts do find that the complete failure to provide for notice and comment is harmless, for instance, when an agency's substantive rule is "the only reasonable one" that the court "would reverse . . . if [the agency] came out the other way." *Sheppard v. Sullivan*, 906 F.2d 756, 762 (D.C. Cir. 1990). In other words, there is no harm from a complete failure when the administrative record demonstrates that the conclusion reached in the administrative rule was the only possible conclusion. In these instances, the lack of notice and comment could not have caused harm because the facts and circumstances reveal that the substantive conclusion reached was the only one possible. That makes testing the rule through public comment and the development of an administrative record unnecessary. *See id*. at 761 (explaining that the language of the statute at issue and the statute's legislative history foreclosed any reading of the provision different from the agency's).

In the cases discussed above, courts have discussed possible prejudice in the civil context. Here, we must determine how shifting the burden from the complaining party to the Government affects the analysis. In civil cases, the burden on a party challenging a rule is more difficult to satisfy when the errors are technical than when an agency has failed completely to provide notice and comment. In the criminal context, the Government will have a heavier burden to show that its complete

failure to comply with § 553's requirements did not cause prejudice than if it had made only technical errors in the promulgation of the relevant rule. The reasons are obvious. In technical-error cases, the Government will more likely have undergone a process that provided notice and permitted some exchange of ideas. That process makes the fulfillment of § 553's purposes more probable and the risk of circumvention less so. On the other hand, in complete-failure cases, the government will not be able to rely on a process that independently satisfies the purpose of requiring notice and comment. It will only be able to assert that the decision it made was inescapable regardless of what comments could have been made.

Here, the Government's burden is heavy because the Attorney General completely failed to provide notice and comment. We conclude that the Government cannot carry that burden. First, as with most "complete failure" situations, the Government has not shown that the purposes of notice and comment have been satisfied. The Interim Rule was never "tested via exposure to diverse public comment," *Prometheus Radio Project*, 652 F.3d at 449. There was never an opportunity for Reynolds—or any other interested party—to provide meaningful comments relating to the substance of the rule. This also means that interested parties never had the "opportunity to develop evidence in the record" to enable more effective review. *Id*. Any suggestion that the

postpromulgation comments to the Interim Rule can satisfy these purposes misses the point. *See Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979) ("We hold that the period for comments after promulgation cannot substitute for the prior notice and comment required by the APA.").

The Government also has not shown that the Attorney General "maintain[ed] a flexible and open-minded attitude towards" the Interim Rule. *Prometheus Radio Project*, 652 F.3d at 449. The Interim Rule demonstrates a single-minded commitment to the substantive result reached: the complete retroactive application of SORNA's registration requirements to sex offenders who were convicted before SORNA's enactment. The Attorney General states that the Interim Rule "serves the narrower, immediately necessary purpose of foreclosing *any dispute* as to whether SORNA is applicable" to pre-SORNA offenders. Interim Rule, 72 Fed. Reg. at 8896 (emphasis added). He sought to eliminate "any dispute" because "sex offenders with predicate convictions predating SORNA who [did] not want to be subject to the SORNA registration requirements, or who wish[ed] to avoid being held to account for having violated those requirements, [*had*] *not been barred from attempting to devise arguments that SORNA is inapplicable to them*." *Id*. (emphasis added). The Attorney General thus states that the purpose of the Interim Rule is to eliminate any dissenting points of view

about whether SORNA's registration requirements were to be applied retroactively—the very subject matter about which he was to keep an "open mind." Under those circumstances, the Interim Rule can hardly be seen as fulfilling the purposes of notice and comment.

The failure to satisfy these purposes is especially troubling because the Attorney General's decision to issue the Interim Rule undermines the very essence of why notice and comment is required. "[T]he essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Dia Nav. Co., Ltd. v. Pomeroy*, 34 F.3d 1255, 1265 (3d Cir. 1994). Notice and comment "avoid[s] the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). Here, the lack of an opportunity for *anyone* to comment on the Interim Rule means that there was never a reintroduction of public participation "after governmental authority [had] been delegated to [an] unrepresentative agenc[y]." *Dia Nav.*, 34 F.3d at 1262. And without public participation, all that is left before an agency promulgates a rule is the agency's ipse dixit that its determination will not be arbitrary and that it is fair to affected parties.

Even the timing of the Interim Rule undermines the reliability of the agency's justification. The rule was

49

promulgated only after the Attorney General realized that his interpretation that SORNA's registration requirements were automatically retroactive was incorrect. Reynolds's conviction thus appears to rest not on carefully considered facts and reason but on a hasty reaction from an Attorney General caught by surprise when courts, including the Supreme Court, disagreed with his interpretation of SORNA. More troubling is that this hasty reaction resulted in an interim rule that reiterated the substantive, unpublished judgment expressed in litigation (that SORNA was retroactive for all pre-SORNA offenders) before the Interim Rule was issued—exactly the type of "unpublished ad hoc determination[]" that is "inherently arbitrary [in] nature" and that notice and comment are intended to avoid, *Morton*, 415 U.S. at 232.

The Government cannot show therefore that the promulgation of the Interim Rule has satisfied the purposes of notice and comment. Like other "complete failure" situations, the process used to promulgate the rule was completely devoid of the "exchange of views, information, and criticism between interested persons and the agency" that ensures well-reasoned and fair rules. *Prometheus Radio Project*, 652 F.3d at 449. The Government has not provided any reason to believe that the purposes of notice and comment are satisfied through other means. Accordingly, it has not met its burden of showing that the failure to comply with notice and

comment did not harm Reynolds.

Furthermore, the Government cannot show that the Attorney General's conclusion was inescapably correct. The strongest argument the Government can muster that full retroactivity was the only possible conclusion is the Fifth Circuit's rationale that "the Attorney General's interim rulemaking [ ] involved a yes or no decision," rather than a "complex regulatory decision" that involved "nuanced and detailed regulations that greatly benefit from expert regulated entity participation." *Johnson*, 632 F.3d at 932. But the Supreme Court, in this very case, recognized that whether to make SORNA's registration requirements retroactive and the scope of any retroactive application did not resemble an on–off switch. Before remanding this case, the Supreme Court recognized the "practical problems arising when the Act sought to apply [ ] new registration requirements to pre-Act offenders." *Reynolds*, 132 S. Ct. at 981–82. And the Court noted that Congress knew that SORNA "could require newly registering or re-registering 'a large number' of pre-Act offenders," which "could prove expensive" and "might not prove feasible to do [ ] immediately." *Id*. at 981 (citing Final Rule, 73 Fed. Reg. at 38063). These considerations, the Court observed, "might have warranted different federal registration treatment of different categories of pre-Act offenders." *Id*. Congress' delegation to the Attorney General was thus a delegation "to examine these pre-Act offender problems" and

51

develop "one efficient and desirable solution." *Id*. Accordingly, the Attorney General's decision regarding the retroactivity of SORNA's registration requirements cannot be considered a foregone conclusion.

As the Supreme Court points out, the Attorney General recognized that his retroactivity decision was not a yes-or-no decision. In the Final Rule, the Attorney General distinguishes between categories of pre-SORNA offenders. *See id*. (citing the Final Rule and a later SORNA regulatory decision to support its conclusion that "different categories of pre-Act offenders" might warrant "different federal registration treatment"). The Final Rule thus requires jurisdictions to register offenders "who remain in the system as prisoners, supervisees, or registrants, or reenter the system through subsequent convictions." It does not require the registration of "offenders who have fully left the system and merged into the general population." Final Rule, 73 Fed. Reg. at 38035. Although this distinction is made only for determining if a state is complying with SORNA—rather than what obligations are imposed on the sex offenders themselves, Final Rule, 73 Fed. Reg. at 38035—the distinction shows that the Attorney General's decision to make the registration requirements uniformly retroactive was not necessarily an across the board yes or no.

The Fifth Circuit's *Johnson* decision offered several other justifications in an effort to show that the

52

complete failure of notice and comment here was harmless.[12] Central to its conclusion that the results

---

[12] The reasoning found in *Johnson* largely tracks Judge Wilson's arguments in his *Dean* concurrence, 604 F.3d at 1288–89 (Wilson, J. concurring). Our analysis is intended to address both.

Judge Wilson includes an additional argument based on the 1995 Administrative Conference of the United States recommendation regarding good cause exceptions:

> Where an agency has used post-promulgation comment procedures, responded to significant adverse comments and ratifies or modified the rule as appropriate, the Conference suggests that a reviewing court generally should not set aside that *ratified or modified rule* solely on the basis that adequate good cause did not exist to support invoking the exemption initially. At this stage, the agency's initial flawed finding of good cause should normally be treated as harmless error with respect to the validity of the *ratified or modified rule*.

Adoption of Recommendations, Recommendation 8-32, "The 'Good Cause' Exemption from APA Rulemaking Requirements," 60 Fed. Reg. 43108, 43112 (Aug. 18, 1995) (emphasis added). The emphasized text shows why

53

would not have differed if notice and comment had been conducted, 632 F.3d at 933, was its determination that "the interim rule publication addressed counter-arguments and set forth the basis and purpose of the rule," *id*. at 931. Specifically, the Fifth Circuit pointed to the Attorney General's discussion of his "authority to prosecute pre-enactment offenders for failing to register," rejection of arguments made by the defendants in litigation that SORNA should not apply to them (such as ex post facto arguments), and explanation that retroactivity furthered the purpose of SORNA. *Id*. at 931–32. Finally, the Court relied on the fact that "[t]here is no suggestion that, if given the opportunity to comment, [the defendant] would have presented an argument the Attorney General did not consider in issuing the interim rule." *Id*. at 932. In essence, the Fifth Circuit determined that the Attorney General addressed all possible arguments that could have been suggested through notice and comment.

We find this reasoning unpersuasive. First, the Fifth Circuit's reasoning misplaces the burden of harmless-error analysis on the defendant. Second, the

Judge Wilson's reliance on the recommendation is unpersuasive. The conference's focus is on the final rule, not the initial rule. Reynolds does not challenge the validity of the Final Rule, thereby rendering the conference's statement inapposite.

54

Fifth Circuit relied on arguments presented in litigation (but not in the Interim Rule) to satisfy the APA's notice and comment requirements—an approach wholly unsupported by law. *See id*. at 932. Furthermore, this approach contradicts the longstanding requirement that we restrict our review to the administrative record. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50; *Dougherty v. U.S. Board for Correction of Naval Records*, 784 F.2d 499, 501 (3d Cir. 1986) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)).

The final reason we cannot agree with the *Johnson* Court's evaluation of the administrative record is that the record does not support a conclusion that the Attorney General's evaluation was truly comprehensive. It is true that the Attorney General discussed the potential ex post facto argument against SORNA and sought to justify his rule by linking it to the law's purpose. Interim Rule, 72 Fed. Reg. at 8896. But the Interim Rule is not all inclusive. It does not respond to several arguments addressed in the Final Rule that were "concerns of a more practical nature." These included "difficulties in finding older convictions and determining whether registration is required for them under SORNA's standards" and concerns about whether Congress' delegation of the retroactivity question should be construed narrowly out of concerns for fairness. Final Rule, 73 Fed. Reg. at 38031. Furthermore, there is no evidence that the Attorney General considered an

alternative to across-the-board retroactivity for all sex offenders in the Interim Rule. These gaps in the Interim Rule's justification—along with the more natural reading of the rule as a reassertion of the Attorney General's interpretation of SORNA in an effort to silence dissenters—all suggest that the Government has failed to demonstrate that the conclusion it reached was truly the only one available.

The Fifth Circuit also declared that "Johnson neither proposes comments he would have made during a comment period nor did he choose to involve himself in the post-promulgation comment period." *Johnson*, 632 F.3d at 933. Reynolds likewise has not proposed any comments he would have submitted nor has he suggested how he would have involved himself in the process itself. Government Supplemental Br. at 35. The Fifth Circuit recognized that the defendant's "participation in these alternative comment forums is not required to find prejudice," but further supported its reliance on this reasoning that "Johnson had constructive notice that the Attorney General would apply SORNA to pre-enactment offenders' when the Attorney General issued the [Proposed Guidelines] on May 30, 2007." *Johnson*, 632 F.3d at 933.

This argument fails because it does not recognize that the prejudice-causing event is the complete absence of notice and comment on the Interim Rule—rather than

56

the Final Rule—from *anyone*. Fundamentally, the *Johnson* Court's argument is that defendants like Reynolds are not prejudiced when they have shown no interest in participating in the notice and comment period. But, as the Fifth Circuit notes, there is nothing that requires a defendant to do so before a court may find prejudice. *Id*. If a comment period had been provided, others who could have asserted his interest—such as public defenders and public-interest groups—would almost certainly have weighed in. *See, e.g.*, 3d Supp. App'x at 102–07 (post-promulgation comments to the Interim Rule by juvenile justice organizations arguing for withdrawal of the Interim Rule), 142–48 (post-promulgation comments by New Jersey Public Defender's Office arguing that SORNA should not be made retroactive), 155–56 (post-promulgation comments by Virginia Attorney General Robert McDonnell expressing concern about the cost of making SORNA uniformly retroactive). The argument that Reynolds was on constructive notice by virtue of the notice of rulemaking is beside the point. To the extent this argument is intended to support the notion that Reynolds would have known that SORNA applied to him, the argument is incorrect. The very nature of the publication of the *Proposed* Guidelines was to state that the rules included in the Guidelines might come into effect—not that the rules were already in effect. These justifications simply cannot carry the Government's burden.

The remaining justification offered by the Fifth Circuit is that "the final rulemaking process with full APA comment did not change the Attorney General's decision." *Id*. at 932–33. This also cannot support a finding of no prejudice, for it would allow agencies to avoid notice and comment by simply issuing an interim rule and subsequently adopting it as the final rule. *See Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 129–30 (3d Cir. 1993) (rejecting a no-prejudice argument asserting that the procedural error was harmless because it did not change the result after reconsideration since having to file a suit to force reconsideration was enough to find prejudice); *accord Utesch*, 569 F.3d at 312 ("[A] reviewing court must focus not merely on the ultimate rule but on the process of an administrative rulemaking; otherwise, an agency could always violate the APA's procedural requirements . . ."). We cannot countenance a justification which has the potential for such mischief.

Our rejection of each of the reasons offered by the Fifth Circuit, upon which the Government relies here, leaves the Government empty-handed. The Government cannot show that the process used to promulgate the Interim Rule satisfies the purposes of § 553 or that the substantive rule was so inescapable that we would have reversed the Attorney General if he had taken an

alternative approach.[13] The *Johnson* Court's arguments are either foreclosed by the Supreme Court's reasoning in *Reynolds*, unsupported by the administrative record, or unpersuasive in light of our placing of the burden on the Government. Accordingly, the Government has failed to show that lack of notice and comment did not prejudice Reynolds.[14]

---

[13] The failure of the proffered justifications also shows that Reynolds can demonstrate prejudice even if he had the burden of showing prejudice. In this situation, Reynolds could carry his burden by showing that the agency completely failed to provide notice and comment and that the result was not inescapable. *See City of Waukesha*, 320 F.3d at 246. As seen, both of these conditions have been satisfied. We cannot say, therefore, that there is no "uncertainty at all" that the effect of the Attorney General's failure was harmless. *Sugar Cane Growers*, 289 F.3d at 96. Accordingly, we would conclude that Reynolds was prejudiced even if he was required to carry the burden.

[14] In addition to the reasons offered, we note that prejudice might be found here because our holding that the Interim Rule is invalid could necessarily mean that there is no legal basis for Reynolds's conviction. At oral argument, the Government contended that the Interim Rule could still serve as the basis for his conviction even if we were to hold that it was illegally promulgated. Oral

Arg. Tr. at 34: 23–24 to 35:1–9. How this can be is unclear. Section 706 requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that cannot withstand review under the standards provided in the section. Our ruling that the Interim Rule cannot survive review under any standard in § 706 would thus seem to require that we "hold unlawful" and "set aside" the Interim Rule such that it cannot be the basis for Reynolds's conviction.

Prejudice follows because prejudice appears to be presumed when courts conclude that the law underlying the defendant's conviction is invalid. *See United States v. Stevens*, 130 S. Ct. 1577, 1583, 1592 (2010) (affirming the vacation of a conviction because the underlying statute violated the First Amendment without undergoing a prejudice analysis); *United States v. Alvarez*, 132 S. Ct. 2537, 2542, 2551 (2012) (same). Such a presumption would only be possible if the absence of a legal basis is structural error. *Neder v. United States*, 527 U.S. 1, 7 (1999). Whether structural error is present when the conduct underlying an indictment is not actually unlawful, because the law making the conduct unlawful is invalid, is one aspect of a question the Supreme Court has thus far avoided. *United States v. Resendiz-Ponce*, 549 U.S. 102, 116–17 (2007) (Scalia, J., dissenting) (explaining that the majority avoided the question of

60

* * *

For all of these reasons, we decline to decide the appropriate standard of review for agency assertions of good cause; we join the Fifth, Sixth, and Ninth Circuits in holding that the Attorney General did not have good cause to waive notice and comment in promulgating the Interim Rule to make SORNA's registration requirement retroactive; and we join the Sixth Circuit in holding that the lack of good cause was prejudicial. We will, therefore, vacate Reynolds's conviction.

---

"whether a constitutionally deficient indictment is structural error").

These issues have not been fully briefed and there is an adequate alternative basis for finding prejudice. Accordingly, we decline to resolve both whether determining that an administrative rule is invalid under § 706 is comparable to concluding that a statute is invalid under the constitution and whether the lack of legal basis for an indictment constitutes structural error.

FISHER, *Circuit Judge*, concurring.

I join the judgment vacating Reynolds' conviction. I concur with the majority in regard to the applicable standard of review and the Attorney General's lack of good cause to forego the APA's notice and comment procedures. However, I take a different approach to the prejudice analysis under 5 U.S.C. § 706.

Because the interests at stake in this matter are criminal in nature, the government bears the burden of showing that the failure to provide notice and comment was harmless. Maj. Op. Part II.C (citing *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) and *O'Neal v. McAninch*, 513 U.S. 432, 440 (1995)). An utter failure, as opposed to a mere technical failure, to provide notice and comment cannot be considered harmless if there is any uncertainty as to the effect of the failure. *Id.* (citing *Sugar Cane Growers Co-op of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002)). Thus, the failure to provide notice and comment will be considered harmless only if the substantive conclusion reached in the absence of notice and comment was the only reasonable one (i.e., we would have reversed if the agency had arrived at a different conclusion). *Id.* (citing *Sheppard v. Sullivan*, 906 F.2d 756, 762 (D.C. Cir. 1990)).

The substantive conclusion of the Interim Rule concerned one specific aspect of SORNA – pre-Act offenders' obligations under the statute. *See* 42 U.S.C. § 16913; 72 Fed. Reg. 8894 ("The Department of Justice is publishing this interim rule to specify that the

requirements of [SORNA] apply to sex offenders convicted . . . before the enactment of that Act."); *see also* 28 C.F.R. § 72.1.  The substantive conclusion of the Interim Rule did not concern the other prominent aspect of SORNA – incorporation of standards by non-federal jurisdictions.  *See* 42 U.S.C. § 16912; 72 Fed. Reg. 8895 (describing the two main aspects of SORNA).

Based on the Supreme Court's recognition of the "practical problems" that arose "when the Act sought to apply the new registration requirements to pre-Act offenders," the majority reasons that the Interim Rule's conclusion was not the result of a simple "yes-or-no decision."  Maj. Op. Part II.C (quoting *Reynolds v. United States*, 132 S. Ct. 975, 981 (2012)).  These "practical problems," however, were not relevant to the Interim Rule's conclusion; rather, these were problems associated with incorporation of SORNA's standards by non-federal jurisdictions.  The Supreme Court specifically stated that the "problems arise out of the fact that the Act seeks to make more uniform a patchwork of pre-existing state systems," and that "[d]oing so could require newly registering or re-registering a large number of pre-Act offenders."  *Reynolds*, 132 S. Ct. at 981 (citing 73 Fed. Reg. 38063) (internal quotation marks omitted).

Notably, the Supreme Court also stated that "[t]hese same considerations might have warranted different federal registration treatment of different

2

categories of pre-Act offenders." *Id.* However, this observation was based on a provision of the final guidelines that also pertained to incorporation of SORNA's standards by non-federal jurisdictions. *Id.* (citing 73 Fed. Reg. 38035-36 and 38046-47). The provision allows non-federal jurisdictions to meet SORNA's incorporation requirements without registering pre-Act offenders who left the system after they were no longer required to register. 73 Fed. Reg. 38035-36 and 38046-47.

Because the Attorney General eventually distinguished between pre-Act offenders still in the system and pre-Act offenders who left the system with regard to the obligations of non-federal jurisdictions, the majority reasons that the same distinction could have been made with regard to the obligations of sex offenders themselves, if the Attorney General had properly observed the thirty-day notice and comment period when promulgating the Interim Rule. Maj. Op. Part II.C.

However, even if a thirty-day notice and comment period could have resulted in SORNA's requirements not applying to pre-Act offenders who had already left the system, this hypothetical change would not have affected a pre-Act offender such as Reynolds, who was still in the system (and was required to register as a sex offender) at the time that he was convicted. The prejudice analysis should focus specifically on Reynolds, rather than on a

3

hypothetical defendant who is not before the Court. *See United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) ("[A] court must determine whether it is clear that the lack of notice and comment did not prejudice *the petitioner*.") (emphasis added); *United States v. Dean*, 604 F.3d 1275, 1289 (11th Cir. 2010) (Wilson, J., concurring) ("Here, though, the decision of the Attorney General, *as far as Dean cared*, was binary – either someone with a pre-enactment offense could be charged, or he couldn't be.") (emphasis added).

The question for this Court is whether the Attorney General, in accordance with the language of the statute, could have declined to apply SORNA's requirements to pre-Act offenders who were still in the system. The answer appears to be yes. There is nothing in the statutory language that would have prevented the Attorney General from declining to apply SORNA's requirements to pre-Act offenders still in the system. The retroactivity decision was not a forgone conclusion, even for pre-Act offenders such as Reynolds. Thus, the substantive conclusion reached in the absence of notice and comment was not the only reasonable one, and the government has not overcome its burden of proving otherwise.

In sum, Reynolds was prejudiced by the Attorney General's failure to abide by the APA's notice and

4

comment procedures.  For this reason, I concur in the judgment vacating Reynolds' conviction.

STAPLETON, J. concurring:

I join the opinion and judgment of the Court. I write only to note additional facts that, for me, provide additional support for the conclusion we reach.

Quoting from the Act's statement of its purpose, the AG summarized his position regarding the good cause issue as follows:

> [Notice and comment] would thwart the legislative objective of "protect[ing] the public from sex offenders and offenders against children" by establishing "a comprehensive national system for the registration of those offenders," SORNA § 102, because a substantial class of sex offenders could evade the Act's registration requirements and enforcement mechanisms during the pendency of a proposed rule and delay in the effectiveness of a final rule.

Interim Rule, 72 Fed. Reg. at 8896-97 (citing 5 U.S.C. § 553(b)(B)).

When SORNA was adopted, all 50 states had registration requirements for sex offenders with criminal penalties for non-compliance, and Congress had made the failure of sex offenders to register in accordance with state law a federal offense, albeit one with lesser penalties than SORNA. 42 U.S.C. § 14071. The purpose of SORNA was to make existing law more efficient by creating "a comprehensive national system" of registration. Both Congress and the AG realized that the creation of such a

system would take a substantial period of time. As of the date the Interim Rule was adopted, no state had implemented SORNA, and the Act gave states up to three years to do so. 42 U.S.C. § 16924.The AG provides no explanation for how on February 28, 2007, a thirty day period for comment would have posed the kind of imminent and serious harm that would support a finding of good cause.

In short, I agree with the Ninth Circuit in *United States v. Valverde*, 628 F.3d 1159, 1168 (9th Cir. 2011) (footnote omitted):

> The issue is not whether sex offenders should register, but rather whether the addition of one more layer of federal protection atop a substantial quilt of existing state and federal laws merited emergency treatment." *See Dean*, 604 F.3d at 1283 (Wilson, J. concurring). Judge Wilson convincingly reasoned that "the existence of stringent state and federal criminal sanctions on the books at the time the [interim] regulation was promulgated obviated the case for an emergency." *Id.* (footnote omitted). The Attorney General provided no reason why, in view of the existing statutory regime that already imposed registration requirements on pre-SORNA sex offenders, it was necessary for the interim rule to be made effective immediately, without providing any opportunity for notice and comment.

2

As a result, the AG has failed to carry his burden of proving good cause.